[Cite as *Century Business Servs., Inc. v. Barton*, 197 Ohio App.3d 352, 2011-Ohio-5917.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95542**

# CENTURY BUSINESS SERVICES, INC., ET AL.,

APPELLEES,

v.

# BARTON ET AL.,

APPELLANTS.

## JUDGMENT:
## AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-667264

**BEFORE:** Kilbane, A.J., Jones, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** November 17, 2011

**ATTORNEYS:**

Ulmer & Berne L.L.P., Jeffrey S. Dunlap, Ronald H. Isroff, and Reem Shalodi; and Stinson Morrison Hecker, L.L.P., and John C. Aisenbrey, for appellees.

McCarthy, Lebit, Crystal & Liffman Co., David A. Schaefer, and Leslie E. Wargo; and Lommen, Abdo, Cole, King & Stageberg, P.A., Phillip A. Cole, Kay Nord Hunt, and Diane M. Odeen, for appellants.

MARY EILEEN KILBANE, Administrative Judge.

{¶ 1} Defendants-appellants, Thomas Barton, Anthony Krier, James Stelzer, and John Walter, appeal from the judgment of the trial court that granted plaintiff-appellee, Century Business Services, Inc., otherwise known as CBIZ, Inc., and its subsidiary CBIZ BVKT, L.L.C., d.b.a. CBIZ Accounting & Tax Advisory, L.L.C. (collectively referred to as "CBIZ"), injunctive relief, damages, attorney fees, litigation fees, and costs in CBIZ's action for breach of various agreements. For the reasons set forth below, we affirm.

{¶ 2} This matter arises from a series of agreements that CBIZ entered into with defendants, certified public accountants who are licensed by the state of Minnesota and work in Minnesota. In 1988, Barton was hired by the New Hope, Minnesota firm of Bertram, Vallez, Kaplan & Talbot, Ltd. ("Bertram Vallez"), an accounting firm that performs "attest accounting services," or services such as audits, reviews of financial statements, and examinations of financial information that require an accountant to exercise independence, and "nonattest services," such as bookkeeping services, payroll services, and tax services.[1] According to Minn.Stat.

---

[1]The American Institute of Certified Public Accountants ("AICPA") defines an attest engagement in its Statement on Standards for Attestation Engagements (originally issued in March 1986) as an engagement in which a practitioner is engaged to issue or does issue a written communication that expresses a conclusion about the reliability of a written assertion.

326A.10, only CPA licensees may perform attest services. Minnesota nonetheless recognizes an "alternative practice structure" under which a company may be compensated for providing staffing and labor for attest accounting services and performing nonattest services. See Minn.Stat. 326A.02.

**Barton's Agreements**

{¶ 3} By 1998, Barton had become a shareholder at Bertram Vallez, and defendants Krier, Stelzer, and Walter were also working there under employment agreements. On August 20, 1998, CBIZ, an Ohio company that is not a licensed public accounting firm, bought Bertram Vallez's nonattest accounting practice for $12 million and renamed it "CBIZ BVKT, L.L.C." ("CBIZ BVKT"). Barton received $184,756 in cash and 12,545 shares of CBIZ stock, plus an "earn-out" payment of $112,320 and an additional 6,815 shares of stock. On August 20, 1998, Barton and other shareholders of Bertram Vallez signed an agreement and plan of merger ("merger agreement") and an executive-employment agreement.

{¶ 4} The merger agreement prohibited Barton from disclosing confidential information, including information pertaining to clients and prospective clients and information pertaining to employees. The noncompetition provision of the merger agreement prohibited Barton and the other shareholders from entering into, engaging in, promoting, or assisting any business that competes with CBIZ BVKT in the greater Minneapolis metropolitan area, encompassing seven counties, for five years

4

from the date of the agreement, which would be August 20, 2003. The noncompetition provision additionally prohibited Barton from soliciting clients and prospective clients, inducing CBIZ BVKT employees, agents, and others to terminate their relationship with the corporation, and from employing such individuals for ten years from the date of the agreement, or until August 20, 2008.

{¶ 5} The merger agreement further indicated that violations and attempted violations would entitle CBIZ BVKT to liquidated damages, entitling CBIZ BVKT to 100 percent of the gross revenue derived from violation of the merger agreement.

{¶ 6} Barton and CBIZ BVKT also signed an executive-employment agreement in August 1998. This document provided that Barton's employment would commence on August 20, 1998, and "expire on the seventh anniversary of" that date, or August 20, 2005, but that Barton's obligations under Sections 6-10 of the executive-employment agreement would "survive expiration of" the seven-year term.

{¶ 7} Section 6 of the executive-employment agreement set forth various restrictions in place "during the period in which the Executive is employed by the Company and for five (5) years thereafter" and provided that Barton would not engage in any business that competes with CBIZ BVKT in the seven counties comprising the greater Minneapolis metropolitan area, would not solicit CBIZ BVKT

clients, would not induce CBIZ BVKT employees and other individuals to terminate their relationship with the corporation, and would not employ such individuals.

{¶ 8} Section 7 of the executive-employment agreement also prohibited Barton from disclosing at any time "confidential information," which was defined to include the names, addresses, and telephone numbers of clients and "qualified prospective clients" and employees' compensation rates.

{¶ 9} Remedies for violations were set forth in Section 10 and included a liquidated-damages provision entitling CBIZ BVKT to 100 percent of the gross revenue derived during the two-year period following the violation and also included injunctive relief.

### Stelzer's, Walter's, and Krier's Agreements

{¶ 10} Following the sale of the nonattest accounting services to CBIZ BVKT, Bertram Vallez continued to perform attest accounting services. Bertram Vallez then entered into an administrative services agreement with CBIZ BVKT, wherein it agreed that CBIZ BVKT would provide nonattest accounting services for its clients and Bertram Vallez would provide only attest accounting services and would purchase its professional administrative services from CBIZ BVKT.

{¶ 11} Upon the execution of the agreements described infra, all of Bertram Vallez's existing employment contracts were terminated. Defendants Stelzer, Walter, and Krier continued to work as at-will employees of CBIZ BVKT. By 2004,

CBIZ BVKT informed these employees that they were required to sign a confidentiality-and-nonsolicitation agreement, which prohibited them from soliciting firm clients and employing firm employees. The confidentiality-and-nonsolicitation agreement also contained a liquidated-damages provision entitling CBIZ BVKT to 100 percent of the gross revenue derived during the 24-month period following the violation. It provided that the agreement would be governed and construed in accordance with the laws of the state of Ohio and that if disputes arose, the employee would submit to Ohio jurisdiction with venue in Cuyahoga County and would consent to service of process.

### 2005 Merger

{¶ 12} In 2005, CBIZ BVKT informed defendants that in order to remain in New Hope, Minnesota, Bertram Vallez would be merged into Mayer Hoffman McCann, P.C. ("MHM"), an entity that was also located in New Hope, Minnesota, and also had an administrative-services agreement with CBIZ, under which it provided accounting services under the "alternative practice structure." CBIZ provided personnel to assist with the attest accounting services, and CBIZ performed the nonattest accounting services.

{¶ 13} Bertram Vallez subsequently consented to the merger and terminated its accounting practice. Defendants signed various agreements with MHM and became employees and shareholders of that entity.

**{¶ 14}** By late 2007, CBIZ BVKT informed defendants that CBIZ BVKT's New Hope office was to be consolidated with CBIZ's office in Minneapolis, Minnesota. On August 1, 2008, defendants resigned from CBIZ BVKT and MHM and formed Barton, Walter & Krier, L.L.C. ("BWK"). On August 2, 2008, under letterhead from the new firm, defendants informed their clients of their resignations, provided them with defendants' new e-mail addresses and phone numbers, and provided them with form letters for terminating their existing relationship with CBIZ BVKT and MHM and for engaging BWK. On August 2, 2008, defendants contacted some of their former co-workers at the New Hope office and offered them positions with BWK. On August 4, 2008, ten other employees resigned from CBIZ BVKT.

**{¶ 15}** On August 7, 2008, CBIZ and CBIZ BVKT filed a complaint against defendants[2] for breach of the merger agreement, breach of the executive-employment agreement, breach of the confidentiality-and-nonsolicitation agreement, breach of duty of loyalty, and trade-secret misappropriation. On that same day, CBIZ obtained an ex parte temporary restraining order against defendants, which prohibited them from soliciting CBIZ clients or entering into any business that competes with CBIZ in the greater Minneapolis metropolitan area and ordered them to return property and "any information of any sort" to CBIZ.

---

[2] Plaintiffs additionally sued former managers Thomas Lee and Paul Wallenfelt, but ultimately, plaintiffs did not seek damages against them at trial, and no damages were awarded against these individuals.

{¶ 16} The trial court held a consolidated hearing on the preliminary and permanent injunctions on September 4, 2008, per the agreement of the parties. Thereafter, on October 9, 2008, the trial court granted the preliminary and permanent injunctions, concluding that defendants had breached their confidentiality-and-nonsolicitation agreement and that CBIZ was entitled to injunctive relief. The court ordered that for a period of five years from the date of its order, Barton was enjoined from engaging in, promoting, assisting, or consulting with any business that competes with CBIZ; soliciting, attempting to solicit, and calling upon any of CBIZ's clients or prospective clients; inducing employees, agents, and various others to terminate its relationship with the corporation; and employing those individuals. The remaining defendants were similarly enjoined for a two-year period. The court also concluded that plaintiffs were entitled to attorney fees and costs associated with the injunctive relief and held a hearing as to the issues of contempt of court, attorney fees, and expenses on January 20, 2009.

{¶ 17} CBIZ's claims for money damages proceeded to a jury trial on January 25, 2010. Timothy Talbot, senior managing director of the Minneapolis CBIZ office, testified that CBIZ bought the nonattest accounting practice from Bertram Vallez for around $12 million. At that time, Barton signed the merger agreement and the executive-employment agreement, which contained noncompetition and nonsolicitation provisions. The noncompetition term remains in effect for five years

after the end of Barton's employment with CBIZ. The agreements provide for injunctive relief plus damages in the amount of 100 percent of the fees for that client for two years.

{¶ 18} Talbot also established that after CBIZ bought Bertram Vallez, its existing employment contracts were terminated. Defendants Krier, Walter, and Stelzer then worked at CBIZ as at-will employees.

{¶ 19} Talbot stated that in 2008, CBIZ decided to consolidate MHM with its downtown Minneapolis office. Defendants voiced objections to moving downtown, but after a series of meetings, Talbot believed that they had agreed to do so. On the afternoon of Friday, August 1, 2008, however, each of the defendants had left resignation letters on the keyboard of Talbot's computer.

{¶ 20} CBIZ subsequently retained a forensic computer specialist, Mark Lanterman of Computer Forensic Services, who established that defendants had downloaded confidential client information, employee personnel information, templates, and spreadsheets. Eventually, Talbot received disengagement letters from approximately 500 of CBIZ's former clients. Talbot acknowledged that Bertram Vallez owned client lists and client files before the merger with CBIZ and that after Bertram Vallez's merger with CBIZ, client lists were openly shared between the two entities.

{¶ 21} Michael Gleespen, general counsel for CBIZ, testified that under Minnesota law, it is permissible for CBIZ to provide labor for attest work if the employee remains under the direction and control of a CPA. Further, under Minnesota law, the relationship between the client and the licensee is actually a relationship between the client and the CPA firm, rather than individual accountants. As to confidentiality, Gleespen testified that CBIZ's information and files were protected by a detailed security policy that employees were required to sign.

{¶ 22} Gleespen further established that the total average billing for all four defendants was $4,474,275.16 in the years 2006 and 2007. Most of the billing reflects work for nonattest services, rather than for attest services. Gleespen indicated that CBIZ had incurred a $7 million loss due to defendants' breach of their contracts.

{¶ 23} Lanterman testified to the data analysis performed in this matter. Lanterman analyzed the computer hard drives of computers that defendants used for their competing accounting practice and computers they had used at CBIZ, as well as other external storage devices. Using the search terms "CBIZ," "MHM," "BVKT," and variations of those terms, Lanterman determined that data had been copied from defendants' CBIZ computers to other devices and that there had been a mass deletion of information from a CBIZ BVKT computer. Lanterman also established that

Computer Forensic Services had billed approximately $600,000 for its work in this matter.[3]

{¶ 24} Defendant Stelzer testified on cross-examination that he is a licensed CPA and began work for Bertram Vallez in 1993. After resigning from CBIZ in August 2008, he became the managing partner of defendants' new firm, BWK. He admitted signing the confidentiality-and-nonsolicitation agreement and that he had solicited clients and employees in violation of that agreement, but he stated that approximately 80 percent of the new firm's clients were former CBIZ clients and that he continues to perform the same services he had provided for CBIZ.

{¶ 25} Stelzer next stated that he and the defendants did not want to move to the downtown Minneapolis location, but he admitted that he did not inform CBIZ of his intentions. He was also unaware that CBIZ had continued to maintain office space in New Hope for the convenience of clients and workers. Stelzer admitted downloading information, including confidential client and billing information, from the CBIZ computer, but he stated that he had done so on a regular basis during his employment with CBIZ. He stated that under Minnesota law, a licensed CPA's information is the property of the individual CPA.

{¶ 26} Defendant Thomas Barton also testified on cross-examination. He admitted that he signed the merger agreement and received $184,000, plus 12,545

---

[3]This aspect of the testimony was similar to Lanterman's testimony at the January 20, 2009 hearing.

shares of CBIZ stock. He later received an additional $112,000 and 6,815 shares of stock. Barton admitted that following his resignation from CBIZ, he solicited CBIZ employees and clients for his new firm, BWK. He has done attest and nonattest work for the clients he solicited.

{¶ 27} Defendant Anthony Krier admitted on cross-examination that he had taken client information to use at BWK, and he admitted that approximately 80 percent of BWK's clients had been CBIZ clients.

{¶ 28} Jerome Grisko, president and CEO of CBIZ, Inc., testified that he had served as manager of CBIZ's New Hope office. This office performs attest and nonattest services, but the client list belongs to CBIZ. In 2007, CBIZ's New Hope office had the second highest profit margin of all the 27 CBIZ offices. The New Hope office was to be consolidated with a downtown office as part of a larger pattern of consolidating nearby offices with complementary services.

{¶ 29} Forensic accountant Robert Brlas, of BBP Partners, testified as a valuation expert for CBIZ. Brlas stated that he conducted a liquidated-damages calculation and a lost-profits analysis. Under the liquidated-damages calculation, CBIZ had sustained liquidated damages in the amount of $6,423,955. Under the lost-profits analysis, CBIZ lost $7,255,024 in profits due to the actions of defendants.

{¶ 30} For their case, defendants presented testimony, videotaped depositions, and transcripts of depositions. Michael Kohler, CEO of Millstone Systems, Inc., of

Golden Valley, Minnesota, testified that Krier had performed chief financial officer ("CFO") functions for his company and that he had no real relationship with CBIZ. He retained Krier following the split with CBIZ, and he does not want to parse out the attest and nonattest services to different companies. David Gonyea of Gonyea Development also testified that Krier had been his accountant for years.

{¶ 31} Frank Pichelman, president of Ardel Engineering & Manufacturing, likewise testified, via videotaped deposition, that Barton has been his accountant for the last ten years and he selected BWK as his accounting firm. He preferred a suburban company and would not have chosen an accountant located in downtown Minneapolis.

{¶ 32} Greg Evgen, the owner of Regal Machine, Inc., and Advanced Machine Technologies, Inc., and John Timmersman, CEO of Marshall Manufacturing, testified that Barton has been their accountant for many years. Both men hired BWK following Barton's departure from CBIZ and did not want to go to an accounting practice in downtown Minneapolis.

{¶ 33} Defendant Anthony Krier testified that he is a licensed CPA. According to Krier, the Bertram Vallez firm had a client list, and it created client invoices for its attest work. He further asserted that he did not want to sign the confidentiality-and-nonsolicitation agreement because he received no consideration for it. By the winter of 2004, however, Talbot informed him that he would not

receive the rest of his compensation for the year until he signed and returned the confidentiality-and-nonsolicitation agreement.

{¶ 34} Defendant Stelzer testified, with regard to the confidentiality-and-nonsolicitation agreement, that Talbot informed him that he would not receive the bonus he earned in 2004 if he did not sign the agreement.

{¶ 35} Stelzer further testified that he opposed the move to the Minneapolis office because it would mean more expenses and more competition. He admitted that he and the others solicited their former clients, but he stated that only about 10 percent of BWK's clients are from CBIZ, but about 71 percent are original customers of Bertram Vallez, and about 19 percent are new clients. After Stelzer and the others resigned, they still needed their client papers, which under Minnesota law, belong to the CPA.

{¶ 36} Kristie Hasselbroek, the bookkeeper for CBIZ who was hired by BWK, testified that after leaving CBIZ, she copied various information folders.

{¶ 37} Lance Bolson, CBIZ's information and technology officer, and site controller, stated that Barton and Krier met with him in July 2008 and offered him the job of controller if he joined BWK. Bolson submitted a letter of resignation to CBIZ on August 4, 2008. He then used a flash drive to copy all the data from his CBIZ computer. He testified that he believed that the data belonged to the client. He later deleted all the CBIZ information that he had.

**{¶ 38}** Albert Vondra of PriceWaterhouseCoopers accounting firm provided expert testimony as to the value of the business that CBIZ lost to BWK. Based upon his review of various annual reports and quarterly financial records filed by CBIZ, CBIZ incurred liquidated damages of $1,137,000.

**{¶ 39}** Vondra further testified that CBIZ's valuation expert Brlas's calculations were erroneous in that they were based upon a five-year projection of increasing revenues, which was out of line with the actual attest revenues and CBIZ's financial statements.

**{¶ 40}** Barton testified that he has been a practicing accountant for 25 years and that clients such as Evgen and Timmersman have been with him for decades. Most of his clients are small-business owners who do not want to hire downtown firms. He further stated that he netted $300,000 after CBIZ purchased the nonattest practice from Bertram Vallez. Following the purchase, both entities used the same client list.

**{¶ 41}** Barton acknowledged on cross-examination that about 80 percent of his clients are in the seven counties set forth in the noncompetition provision. He also acknowledged that the client-engagement letters that he had used prior to forming BWK indicated that the entities CBIZ BVKT or MHM would be the holder of client information, as opposed to the client's individual accountant.

**{¶ 42}** Walter testified that he has been an accountant for over 20 years. He performs attest services and has had long-term clients. With regard to the confidentiality-and-nonsolicitation agreement, he stated that he received no consideration for signing this document and that Talbot informed him that he would not receive the balance of his 2003 earnings until he signed the document. On cross-examination, he admitted to soliciting CBIZ clients after he joined BWK.

**{¶ 43}** Finally, CBIZ presented rebuttal testimony from Talbot and Grisko in which they indicated that defendants were told that they could rejoin CBIZ, but if they did not do so, the company would do all it could to protect its interests and legal rights.

**{¶ 44}** At the close of the evidence, the trial court determined that there was sufficient consideration to support the confidentiality-and-nonsolicitation agreements under either Ohio law or Minnesota law. The court directed a verdict in favor of CBIZ on the breach of contract, and the matter was submitted to the jury on the issue of damages.

**{¶ 45}** The jury awarded CBIZ actual and liquidated damages totaling $4,450,936 ($1,725,219 against Walter, $940,394 against Stelzer, $1,371,968 against Krier, and $413,355 against Barton). The jury found in favor of defendants on the claims for misappropriation of trade secrets and breach of confidentiality.

**{¶ 46}** The trial court additionally concluded that under the terms of the confidentiality-and-nonsolicitation agreement, CBIZ was also entitled to legal fees and costs. Following an evidentiary hearing, May 12, 2010, the trial court ordered Krier, Walter, and Stelzer to pay CBIZ $170,833.89, the attorney fees and costs incurred to the date of the permanent injunction; $154,371.71 for CBIZ's computer forensic expert, Lanterman, for work performed as of the date of the permanent injunction; and $706,984.36 for CBIZ's attorney fees and costs incurred from the date of the permanent injunction through the end of the trial. The court additionally ordered that defendants Krier, Walter, and Stelzer pay plaintiffs $88,898.91 for fees and expenses of CBIZ's co-counsel, John Aisenbrey of Stinson Morrison Hecker, L.L.P. The court ordered that these defendants pay $185,068.57 for other litigation expenses, including court reporters and expert witnesses. Finally, the court awarded CBIZ prejudgment interest, plus interest at the statutory rate.[4]

**{¶ 47}** Defendants now appeal.[5]

**{¶ 48}** Defendants' first assignment of error states:

**{¶ 49}** "The court had no personal jurisdiction over Barton."

---

[4]The court then set total judgment awards as follows: $449,186.65 against Barton, $1,874,769.49 against Walter, $1,490,896.96 against Krier, and $1,021,911.99 against Stelzer.

[5]A total of nine errors are listed as assignments of error, but several assignments of error are actually argued within related errors and are therefore not quoted within this opinion.

18

{¶ 50} Within this assignment of error, defendants assert that there was no personal jurisdiction over Barton because the noncompetition provision of the merger agreement expired after five years from the date of signing, i.e., on August 20, 2005; the nonsolicitation provision of the merger agreement expired after ten years from the date of signing, i.e., on August 20, 2008; and the forum-selection clause of the executive-employee agreement expired after seven years from the date of signing, i.e., on August 20, 2005.

{¶ 51} The merger agreement signed by Barton stated that it was governed by Ohio law and that the "Shareholders irrevocably submit to the jurisdiction and venue in Cuyahoga County, Ohio for 'any dispute' arising out of the agreement."

{¶ 52} In addition, Barton's executive-employment agreement stated:

> Executive hereby irrevocably submits to the jurisdiction of the courts of the State of Ohio, with venue in Cuyahoga County, over any dispute arising out of this Agreement and agrees that all claims in respect of such dispute or proceeding shall be heard and determined in such court. Executive hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which he may have to the venue of any such dispute brought in such court[.]

{¶ 53} This document indicates, however, that it would be governed by the laws of the state of Minnesota.

{¶ 54} Under the laws of the state of Minnesota, trial courts are vested with discretion to enforce a forum-selection clause, and the court's decision will not be disturbed unless the clause is so unreasonable that its enforcement would be clearly

19

erroneous and against both logic and the facts on record. *C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc*. (Minn.App.2009), 772 N.W.2d 528.

{¶ 55} Likewise, under the laws of the state of Ohio, in the absence of fraud or overreaching, forum-selection clauses are valid and enforceable if they are reasonable and just. See *Discount Bridal Serv., Inc. v. Kovacs* (1998), 127 Ohio App.3d 373, 376-377, 713 N.E.2d 30; *Premier Assoc., Ltd. v. Loper,* 149 Ohio App.3d 660, 2002-Ohio-5538, 778 N.E.2d 630.

{¶ 56} By application of the foregoing, we hold that the trial court properly exercised personal jurisdiction over Barton in this matter. Personal jurisdiction over Barton was vested in the courts of Cuyahoga County, Ohio under the terms of the agreements that Barton signed on August 20, 1998. Defendants did not present any argument that the agreements were unfair, unreasonable, or unjust. Moreover, the clauses at issue pertain to any dispute arising out of the agreement and are not limited to a specified duration.

{¶ 57} The first assignment of error is without merit.

{¶ 58} Defendants' second assignment of error states:

{¶ 59} "Krier, Walter and Stelzer's confidentiality and nonsolicitation agreements fail for lack of consideration."

{¶ 60} Within this assignment of error, defendants maintain that the validity of the confidentiality-and-nonsolicitation agreements must be determined under

20

Minnesota law and that under Minnesota law, noncompetition agreements entered into subsequent to an initial employment contract require independent consideration beyond the mere continuation of employment.

{¶ 61} We review this issue de novo. *Stephen Dev. Co. v. Farm Bur. Life Ins. Co. of Michigan* (Oct. 30, 2000), Stark App. No. 1999CA00387, 2000 WL 1663596, citing *Castlebrook Ltd. v. Dayton Properties Ltd. Partnership* (1992), 78 Ohio App.3d 340, 604 N.E.2d 808.

{¶ 62} As to the choice-of-law issue, we note that Ohio follows the rule that when the parties have specifically designated a forum other than the place of performance, the parties' choice-of-law provisions are enforceable unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties." *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 453 N.E.2d 683, syllabus.[6] The *Schulke* court held that under these circumstances, the correct rule to

---

[6]The *Schulke* analysis is applied even when the parties have set forth a choice of law and indicated that it is to be applied "without regard to principles of conflicts [sic] of law[s]." See *Greif Packaging, L.L.C. v. Ryder Integrated Logistics, Inc.*, Lucas App. No. L-09-1259, 2010-Ohio-4384; *Tyler v. Sento Corp.* (Nov. 25, 2008), N.D.Ohio No. 5:08 CV 1047.

apply is set forth in the Restatement of Law 2d (1971) 561, Conflict of Laws, Section 187, which provides as follows:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of §188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

{¶ 63} Section 188 enumerates factors that courts should consider in the absence of an effective choice of law by the parties. *Ohayon v. Safeco Ins. Co. of Illinois* (2001), 91 Ohio St.3d 474, 747 N.E.2d 206. Under Section 188, courts should consider (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Id. at 477.

{¶ 64} In this matter, the contracts were negotiated and signed in Minnesota. The place of performance of the contracts is Minnesota. The parent company of CBIZ is located in Ohio, and it appears that many of the agreements governing CBIZ's relationships are governed by Ohio law. CBIZ BVKT conducts no business

in Ohio, but we recognize that pursuant to Restatement of Law 2d (1971) Conflict of Laws, Section 187, Comment f, the state where one of the parties is domiciled or has his principal place of business is sufficient to establish a "substantial relationship" to the parties.

**{¶ 65}** As to whether application of the law of the chosen state would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state in the determination of the particular issue, we note that under Minnesota law, noncompetition agreements are "'invalid unless bargained for and supported by adequate consideration.'" *Schmit Towing, Inc. v. Frovik* (Nov. 9, 2010), Minn. App. No. A-10-362, quoting *Sanborn Mfg. Co. v. Currie* (Minn.App.1993), 500 N.W.2d 161, 164. In addition, noncompetition agreements entered into subsequent to an initial employment contract require independent consideration. *Schmit Towing,* citing *Overholt Crop Ins. Serv. Co., Inc. v. Bredeson* (Minn.App.1989), 437 N.W.2d 698, 702; *Medtronic, Inc. v. Hedemark* (Mar. 30, 2009), Minn.App. No. A08-0987; *Cook Sign Co. v. Combs* (Aug. 26, 2008), Minn.App. No. A07-1907. As stated in *Schmit Towing*, "The underlying public-policy concern is based on the disparity in bargaining power that exists in an employer-employee relationship[.]"

**{¶ 66}** Nonetheless, Minnesota courts have found adequate consideration when the employee receives training and support in licensing applications. See *Witzke v. Mesabi Rehab. Serv. Inc.* (Minn.App. 2008), Minn.App. No. A07-0421.

**{¶ 67}** In Ohio, however, continued employment is sufficient consideration to enforce a noncompetition agreement entered into after the commencement of an employment relationship. See *Lake Land Emp. Group of Akron, L.L.C. v. Columber,* 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27.

**{¶ 68}** We further note, however, that pursuant to Restatement of Law 2d (1971) Conflict of Laws, Section 187, Comment g,

> The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law. * * *
>
>        * * *
>
> To be "fundamental," a policy must in any event be a substantial one. * * * a policy of this sort will rarely be found in a requirement, * * *, that relates to formalities (see Illustration 6).[7] Nor is such policy likely to be represented by * * * general rules of contract law, such as those concerned with the need for consideration (see Illustration 8).[8] On the other hand, a fundamental policy may

---

[7]This illustration states:

    "6. In state X, P and D initial an agreement which calls for performance in state Y. The contract states that the rights of the parties thereunder shall be determined by Y law. In X, P sues D for breach of the contract, and D defends on the ground that the contract is void under the X statute of frauds, since it was not signed by him. The contract, however, is valid under Y local law. The X court will find for P."

[8]This illustration states:

    "8. A executes and delivers to B in state X an instrument in which A agrees to indemnify B against all losses arising from B's liability on a certain appeal bond on behalf of C, against whom a

be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Statutes involving the rights of an individual insured as against an insurance company are an example of this sort (see §§ 192-193).

{¶ 69} Applying all the foregoing, we recognize that application of the law of the chosen state, Ohio, differs from the law of Minnesota with regard to the issue of whether independent consideration is required for a noncompetition agreement entered into after the commencement of an employment relationship. However, because Minnesota recognizes the adequacy of consideration when there are advantages available to the employee as the result of the agreement, and in light of the comments and illustrations of Restatement of Law 2d (1971), Conflict of Laws, Section 187, we cannot say that Ohio law is contrary to a fundamental policy of the state of Minnesota. Further, we cannot conclude that Minnesota has a materially greater interest than Ohio in this matter. Therefore, the parties' choice of Ohio law was properly enforced in this matter and applied to determine the validity of the noncompetition agreements signed by defendants Krier, Walter, and Stelzer.

{¶ 70} This assignment of error is without merit.

{¶ 71} Defendants' third assignment of error states:

{¶ 72} "The restrictions on Barton are excessive under Minnesota law."

---

judgment has been rendered in state Y. The instrument recites that it shall be governed by the law of Y. It is valid and enforceable under the local law of Y but is unenforceable for lack of consideration under the local law of X. In an action by B against A, the instrument will not be held invalid for lack of consideration."

{¶ 73} Within this assignment of error, Barton argues that the five-year time period of the permanent injunction is excessive because, under Minnesota law, noncompetition agreements must not unreasonably restrict the former employee's ability to earn a living and must be narrowly tailored to fit the employer's legitimate business interests. According to Barton, five years is excessive under these standards as a matter of law and beyond the time limit set forth in the contract, August 20, 2010. He further maintains that the agreements are ambiguous as to the law to be applied and the duration. He additionally argues that because CBIZ was awarded liquidated damages, it has been adequately compensated, so an injunction is not appropriate.

{¶ 74} With regard to procedure, we note that the grant or denial of an injunction is solely within the trial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 524 N.E.2d 496.

{¶ 75} The noncompetition provision of the merger agreement stated that it was governed by Ohio law, and the executive-employment agreement, which also contains a noncompetition provision, is governed by the law of Minnesota. Under Ohio law, a noncompete provision will be found to be reasonable when the employer can show by clear and convincing evidence that the restrictions imposed by the noncompete provision (1) are no greater than necessary for the protection of the

26

employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public. *Brentlinger Ents. v. Curran* (2001), 141 Ohio App.3d 640, 752 N.E.2d 994; *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 594 N.E.2d 1027; *Levine v. Beckman* (1988), 48 Ohio App.3d 24, 548 N.E.2d 267, citing *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 325 N.E.2d 544.

{¶ 76} In Ohio, however, restrictive covenants entered into simultaneously with the sale of a business may be enforced if they are reasonable under the test articulated in *Raimonde*; see *J & B Fleet Indus. Supply, Inc. v. Miller*, Mahoning App. No. 09 MA 173, 2011-Ohio-3165.

{¶ 77} Under Minnesota law, a noncompetition agreement signed in connection with the sale of a business may be enforced if it does not (1) exceed the protection necessary to secure the good will purchased, (2) place an undue hardship on the covenantor, and (3) have a deleterious effect on the interests of the general public. *Sealock v. Petersen* (Feb. 5, 2008), Minn. App. No. A06-2479, citing *Bess v. Bothman* (Minn.1977), 257 N.W.2d 791, 795.

{¶ 78} Thus, Ohio and Minnesota apply substantially equivalent tests to evaluate noncompete agreements signed in connection with the sale of a business. The court's conclusions that the covenants are reasonable and necessary, that CBIZ established by clear and convincing evidence that defendants breached their

restrictive covenants, that the harm to defendants from the enforcement of the agreements is less than the harm to CBIZ that would result from nonenforcement, and that defendants have alternatives for gainful employment are appropriate and necessary under either the Ohio or Minnesota analysis. We therefore conclude that the trial court did not commit a prejudicial error insofar as it applied Ohio law herein. In any event, even applying Minnesota law, we note that a five-year covenant not to compete that was entered in connection with the sale of a business has been upheld. See *Bothman*.

{¶ 79} Further, as to the claimed ambiguity in the durations set forth in each agreement, we note that the merger agreement prohibited Barton from competing with CBIZ in the seven counties that comprise the greater Minneapolis area for five years from the date of the agreement, or until August 20, 2003, and from soliciting CBIZ clients and employees for ten years from the date of the agreement, or until August 20, 2008, and the executive-employment agreement, signed on August 20, 1998, set forth these restrictions "during the period in which the Executive is employed by the Company and for five (5) years thereafter[.]" Defendants concede, however, that under Section 9.8 of the merger agreement, the rights and remedies of the merger agreement "are cumulative and in addition to all other rights and remedies which may be available[.]" Further, the phrase "during the period in which the Executive is employed by the Company and for five (5) years thereafter" is not

ambiguous in relation to the seven-year "term" of Barton's employment, in light of the separate and distinct language used in each provision and the plain meaning of each provision.

{¶ 80} As to Barton's additional claim that the trial court erred by awarding both equitable relief and monetary damages, we note that "'equitable relief and damages are not necessarily mutually exclusive remedies.'" *Cynergies Consulting, Inc. v. Wheeler*, Cuyahoga App. No. 90225, 2008-Ohio-3362; *Cherne Indus. v. Grounds & Assocs.* (Minn.1979), 278 N.W.2d 81. In this matter, the remedies set forth in the agreements included both liquidated damages and equitable relief. This claim is therefore without merit.

{¶ 81} In accordance with all the foregoing, we find no abuse of discretion in connection with the trial court's permanent injunction.

{¶ 82} The third assignment of error is without merit.

{¶ 83} Defendants' fourth assignment of error states:

{¶ 84} "Labor for attest services is an attest service."

{¶ 85} Defendants next argue that because CBIZ is not permitted to perform attest accounting services, only nonattest services as a matter of law, the trial court erred in enjoining them from performing "labor for attest services." That is, defendants argue that "labor for attest services" is itself an attest service, which CBIZ is not permitted to perform.

**{¶ 86}** In this matter, the terms of the administrative-services agreement indicate that CBIZ would provide the staffing and labor necessary for performance of attest accounting services[9] and that CBIZ would receive 85 percent of the fees earned on attest engagements. There is no indication that CBIZ performs any attest functions.

**{¶ 87}** Moreover, the trial court defined "nonattest accounting services" to include "labor for work on attest services performed under the direction of a certified public accountant or registered accounting firm[.]" This comports with the evidence from the permanent-injunction hearing, wherein CBIZ's general counsel, Gleespen, testified that individuals are not required to be licensed CPAs in order to perform work for certified CPAs on attest services. He stated that under Minnesota law, it is permissible for CBIZ to provide labor for attest work if the employee remains under the direction and control of a CPA. In addition, Talbot testified that CBIZ can employ CPAs to perform accounting work, even though it is not a licensed CPA firm. Further, the evidence indicated that if a CPA was needed for attest work, Bertram Vallez would "have to go to CBIZ and lease that CPA over," i.e., could provide

---

[9]Attest services are described in Minn.Stat. 326A.01 to provide the following financial-statement services: (1) an audit or other engagement performed in accordance with the Statements on Auditing Standards ("SAS"), (2) a review of a financial statement performed in accordance with the Statements on Standards for Accounting and Review Services ("SSARS"), (3) an examination of prospective financial information performed in accordance with the Statements on Standards for Attestation Engagements ("SSAE"), and (4) any engagement performed in accordance with auditing and related standards of the Public Company Accounting Oversight Board.

employees to work with the CPA on the attest work. Therefore, there is no indication that the workers provided by CBIZ are performing any attest functions, and there is competent, credible evidence to support the trial court's conclusions. *Seasons Coal Co. Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

{¶ 88} In accordance with the foregoing, this assignment of error is without merit.

{¶ 89} The fifth assignment of error states:

{¶ 90} "The trial court committed error in awarding CBIZ's attorneys['] fees and expenses in the amount of $966,717.16 and in imposing it on a joint and several basis."

{¶ 91} Here, defendants contend that there is no contractual basis for the award of attorney fees and expenses. They additionally contend that the trial court abused its discretion because the award is so high as to "shock the conscience" and that a lower fee is in order under Prof.Cond.R. 1.5, as CBIZ prevailed on only one of its claims for relief, the work of its 16 attorneys was not segregated to delineate work on successful versus unsuccessful claims or duplicative work. Defendants also assert that there is no basis for joint and several liability.

{¶ 92} With regard to the basis for attorney fees, we note that in defendants' confidentiality-and-nonsolicitation agreements, defendants agreed to reimburse CBIZ

for "all expenses, including, without limitation, attorneys' fees incurred in enforcing the violations of provisions of this Agreement."

**{¶ 93}** As to the reasonableness of the fees, a court's decision to award fees will not be reversed absent an abuse of discretion. *State ex rel. Sawyer v. Cendroski,* 118 Ohio St.3d 50, 2008-Ohio-1771, 885 N.E.2d 938.

**{¶ 94}** The party seeking the fees has the burden of introducing sufficient evidence of the services rendered and the reasonable value of those services. *In re Verbeck's Estate* (1962), 173 Ohio St. 557, 559, 184 N.E.2d 384. Attorney fees are governed by Prof.Cond.R. 1.5, which sets forth factors that must be considered in determining the reasonableness of fees.[10]

**{¶ 95}** In this matter, David Tocco, Esq., of Vorys, Sater, Seymour and Peas, L.L.P., testified regarding Ulmer & Berne's fee bill in this matter. In the time period preceding the permanent injunction, the amount of the fee was $211,218.32. An additional $120,632.33 was incurred in connection with the motion to show cause. The fees incurred after the permanent-injunction hearing were $713,201.42. After deducting charges solely attributable to the prosecution of claims against Barton,

---

[10] These factors include: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent."

plaintiff sought reimbursement in the amount of $706,984.36. According to Tocco, the fees were reasonable and appropriate under the factors set forth in the Rules of Professional Responsibility and were appropriate for the enforcement of plaintiff's rights.

{¶ 96} Tocco additionally testified that the $111,524.71 fee bill submitted by co-counsel Aisenbrey of Stinson Morrison Hecker, L.L.P., was reasonable and appropriate under the factors set forth in the Rules of Professional Responsibility. Gleespen, general counsel to CBIZ, testified regarding the additional litigation-related expenses that CBIZ incurred additional expenses in this matter, including $149,122 for damages expert Robert Brlas, $14,057.51 for computer expert Brett Harrison, and $11,211 for David Tocco's expert services.

{¶ 97} The trial court subsequently determined that plaintiff's requested fees in the amount of $706,984.36 and the fee of $88,898.91 for Aisenbrey were reasonable and reasonably related to the enforcement of plaintiff's rights. We find no abuse of discretion. A tremendous amount of work was needed to prosecute CBIZ's claims for relief, a vast amount of evidence was involved in this case, complex questions were presented, and a great deal of skill was required to achieve a recovery for CBIZ. Further, although CBIZ did not prevail on all its claims for relief, the record indicates that the claims were related and that the same evidence was offered as to each of the claims for relief.

**{¶ 98}** As to the issue of joint and several liability for the fees, such awards have been ordered when, as here, the defendants act in concert to violate their employer's restrictive covenants. *Huntington Copper Moody & Maguire*, *Inc. v. Cypert* (May 4, 2006), S.D.Ohio No. 1:04-CV-751.

**{¶ 99}** This assignment of error is without merit.

**{¶ 100}** The sixth and seventh assignments of error are interrelated and state:

**{¶ 101}** "The trial court abused its [sic] erred in ordering Appellants Krier, Walter, and Stelzer jointly liable for expenses incurred by Appellees for expert Lanterman."

**{¶ 102}** "The trial court erred in ordering Appellants to pay Lanterman's fee."

**{¶ 103}** Within these assignments of error, defendants argue that the trial court abused its discretion in ordering them to pay the fees for CBIZ's forensic expert, Mark Lanterman, because there is no statutory authority for such an award, the fee was unreasonable and excessive, and his billing was inadequate for proper review. Defendants also contend that the award of the Lanterman fee violates the "law of the case" and the doctrine of res judicata since the court initially denied CBIZ's request for this fee in January 2009, when it totaled $600,721.77, then granted it after trial. Defendants additionally complain that this fee is premised upon CBIZ's breach-of-trade-secrets and confidentiality claims that the jury rejected.

{¶ 104} As to the basis of the fee, we note that the confidentiality-and-nonsolicitation agreements require defendants to reimburse CBIZ for "all expenses * * * incurred in enforcing the violations of provisions of this Agreement."  Further, the trial court determined that Lanterman's "work was critical to the discovery of" the full extent of the client data, software, and employee information taken by defendants.

{¶ 105} As to the amount of the fee, appellate courts review an award of expert-witness fees under an abuse-of-discretion standard.  *Vance v. Marion Gen. Hosp.*, 165 Ohio App.3d 615, 2006-Ohio-146, 847 N.E.2d 1229.   Here, CBIZ presented evidence at the permanent-injunction hearing that it was reasonable in light of the number of computers and data-storage devices that had to be examined in this matter, as well as the tremendous amount of data that had to be reviewed.  The trial court did not abuse its discretion.

{¶ 106} Further, as to the argument that the award violated the "law of the case," we note that there was no action by a reviewing court, and the trial court simply revisited the issue of Lanterman's fee after the conclusion of the trial on the merits,  following its initial consideration of the fee in January 2009, so the trial court's action is not barred by the law of the case.  Cf. *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 462 N.E.2d 410; *Unick v. Pro-Cision, Inc.*, Mahoning App. No. 09 MA 171, 2011-Ohio-1342.  Similarly, the award is not barred by the doctrine of res

judicata since the trial court did not enter a final judgment and did not fully determine the proceedings on the issue following the January 2009 hearing. *Halliday v. Halliday*, Cuyahoga App. No. 92748, 2009-Ohio-5380.

{¶ 107} The sixth and seventh assignments of error are without merit.

{¶ 108} Defendants' eighth assignment of error states:

{¶ 109} "The finding of misappropriation of trade secrets and spoliation is unsupported by the jury verdict and Minnesota law."

{¶ 110} Here, defendants assert that the trial court's permanent-injunction findings that they willfully misappropriated trade secrets and confidential information are erroneous because the court did not identify the specific trade secret that was misappropriated, there was no basis for the award of damages, and the files and information in this matter belong to defendants as the licensed CPAs serving the customer under Minn.Stat. 326A.12 and 13. Defendants additionally argue that they were entitled to a jury trial on this claim and, because the jury ultimately rendered a defense verdict on this issue, the court's permanent-injunction findings to the contrary cannot stand.

{¶ 111} Under the doctrine of res judicata, a valid final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of transaction or occurrence that was the subject matter of a previous action. *Grava v.*

*Parkman Twp.* (1995), 73 Ohio St.3d 379, 653 N.E.2d 226, syllabus. The doctrine is not applied to allow subsequent events to undermine earlier judgments.

{¶ 112} The evidence presented at the hearing on the permanent injunction indicated that CBIZ has an extensive security policy to protect its computer resources, client information, employee policies, and other information. Talbot testified that CBIZ maintains trade secrets and that its client information, employee information, planning, and engagements are confidential. Moreover, Minnesota has sanctioned the alternative-practice structure under which CBIZ holds these documents, and under Minn.Stat. 326A.13, they may be transferred to a "merged firm or successor in interest to the licensee." It was also established that defendants downloaded CBIZ files and CBIZ's Caseware files and forms onto portable storage devices and onto an external hard drive. Over 300,000 files and 2000 tax returns had been copied, and there was a mass deletion of data as well. The record from the permanent-injunction hearing therefore contains competent, credible evidence that defendants took CBIZ's trade secrets and also spoliated some evidence. The trial court's findings on the permanent injunction are supported by the record.

{¶ 113} However, by the time of the jury trial on the claims for damages from these claims for relief, all of CBIZ's confidential information had been returned, and the jury rendered verdicts for the defendants. The verdicts, which were based upon subsequent events, do not undermine the court's earlier findings at the permanent-

injunction hearing and are supported by competent, credible evidence going to all the essential elements of the case, and are not against the manifest weight of the evidence.

**{¶ 114}** This assignment of error is without merit.

Judgment affirmed.

_____

JONES and GALLAGHER, JJ., concur.

_____