RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SIMS BUICK-GMC TRUCK, INC.,

*Plaintiff-Appellant,*

*v.*

No. 16-3871

GENERAL MOTORS LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:14-cv-02238—Solomon Oliver Jr., District Judge.

Argued: October 4, 2017

Decided and Filed: November 20, 2017

Before: CLAY, ROGERS, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Christopher M. DeVito, MORGANSTERN, MACADAMS & DEVITO CO., L.P.A., Cleveland, Ohio, for Appellant. J. Todd Kennard, JONES DAY, Columbus, Ohio, for Appellee. **ON BRIEF:** Christopher M. DeVito, MORGANSTERN, MACADAMS & DEVITO CO., L.P.A., Cleveland, Ohio, for Appellant. J. Todd Kennard, JONES DAY, Columbus, Ohio, for Appellee. John C. Camillus, STOCKAMP & BROWN, LLC, Dublin, Ohio, for Amicus Curiae.

SUTTON, J., delivered the opinion of the court in which CLAY, J., joined. ROGERS, J. (pp. 11–12), delivered a separate dissenting opinion.

---

**OPINION**

---

SUTTON, Circuit Judge.  General Motors provides sales incentives to dealers who sell cars to GM employees, retirees, and their family members at a discounted rate.  As part of the process, the dealer must collect a signed agreement from the purchaser that establishes his eligibility for the program.  In 2014, General Motors audited one of its dealers, Sims Buick-GMC Truck, and discovered a number of transactions in which Sims had failed to collect the agreement from purchasers within the timeline set by General Motors.  GM debited Sims' account $47,493.28 for improper incentive payments, and Sims filed this lawsuit alleging breach of contract and violations of the Ohio Dealer Act.  The district court granted summary judgment for General Motors.  Because the parties' dealership arrangement permitted the debit and because a timely filed Consumer Dealer Agreement constitutes "material documentation" under § 4517.59(A)(20)(a) of the Ohio Dealer Act, we affirm.

I.

Sims Buick-GMC Truck sells GM cars and trucks in Warren, Ohio.  It participates in GM's Vehicle Purchase Program, which allows GM employees, retirees, and their family members, among other affiliates, to buy vehicles at a reduced price.  Each sale under the Purchase Program entitles the dealer to a financial incentive payment.  After the dealer sells a vehicle to an eligible purchaser, the dealer submits an incentive claim to GM, and GM issues a credit to the dealer.  Sims is located near a large GM plant in Lordstown, Ohio, and the Purchase Program accounts for 80% to 90% of its sales.

Under the Purchase Program, the dealer must collect and submit a number of forms, including a Consumer Dealer Agreement.  The Consumer Agreement includes the purchaser's name, qualification for participation in the Purchase Program, and an authorization number generated by General Motors and provided to the purchaser.

General Motors initially did not impose any timing requirement on when dealers collected the Consumer Agreement.  But in 2012, it issued a bulletin that required dealers to

obtain a Consumer Agreement when they delivered the vehicle to the purchaser.  General Motors relaxed this requirement in 2014 by allowing a 30-day grace period after delivery.

In March 2014, General Motors audited Sims' new car sales between March 26, 2013 and January 9, 2014.  The audit revealed a number of transactions under the Purchase Program in which Sims had not obtained a completed Consumer Agreement on time and yet still collected incentive payments from General Motors.  The car company debited Sims' account $66,674.91 for improper payments.  It later reduced the amount to $47,493.28.

Sims sued General Motors in the Ohio Court of Common Pleas alleging breach of contract and violations of the Ohio Dealer Act.  Invoking the diversity jurisdiction of the federal courts, General Motors removed the case to the United States District Court for the Northern District of Ohio, where the parties cross-moved for summary judgment.  The court granted General Motors' motion for summary judgment.

## II.

At summary judgment, the question is whether a genuine issue of material fact requires a trial or whether one party should win as a matter of law.  Civil Rule 56(a).  We review that question with fresh eyes and draw all reasonable factual inferences in favor of Sims.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

*Breach of Contract*.  Sims maintains that General Motors' charge back breached the parties' primary contract, known as the GM Dealer Sales and Services Agreement, because it does not require Sims to collect Consumer Agreements within a set timeframe.  We disagree.

Michigan law, as an initial matter, governs this inquiry.  In a diversity case, we apply the choice-of-law principles of the forum State, here Ohio.  *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir 2017).  Ohio law enforces a contract's choice-of-law provision unless (1) the chosen State has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or (2) its application would contradict a fundamental policy of another State with a materially greater interest in the issue.  *See Sekeres v. Arbaugh*, 508 N.E.2d 941, 942 (Ohio 1987).  The parties chose Michigan

law to govern their disputes under the contract, and neither exception applies.  General Motors maintains its headquarters in Michigan, which suffices to meet Ohio's substantial relationship test.  *See Century Bus. Servs., Inc. v. Barton*, 967 N.E.2d 782, 793–95 (Ohio Ct. App. 2011).  Although Sims does business in Ohio, Ohio's interest in the dispute is no greater than Michigan's.  *See id.*

The contract authorizes the type of deadline that General Motors imposed in this case. Section 11.2 states that the dealer "agrees to timely submit true and accurate applications or claims."  R. 1-1 at 41.  Section 6.3.1 adds that, "[if] General Motors offers any incentives to customers or dealers, and payment is conditioned upon the purchase or lease of a new Motor Vehicle, Dealer agrees to comply with the then current applicable policies and procedures in the General Motors Incentive Manual, as amended from time to time."  *Id.* at 35.  The December 2012 Incentive Manual in turn requires that, under the Purchase Program, the Consumer Agreement must be "signed by the customer and dealer at time of delivery and must be retained in the deal jacket at the selling dealership."  R. 28-1 at 10.

The Incentive Manual also states that "Dealers should refer to the individual incentive program administrative message/bulletins for their official rules and responsibilities under the programs."  *Id.*  On October 2, 2012, General Motors issued Incentive Bulletin 13-06, which like the Incentive Manual provided that the Consumer Agreement "must be signed by the customer and dealer at time of delivery and must be retained in the deal jacket at the selling dealership." *Id.* at 21–23.  On February 1, 2014, GM issued Incentive Bulletin 14-06-004, which relaxed the delivery date deadline and allowed the Consumer Agreement to "be completed and signed no later than 30 calendar days from the date of delivery."  *Id.* at 25–27.

Just as Sims had the right to expect General Motors to make the incentive payments in connection with the Purchase Program, General Motors had the right to expect Sims to comply with the requirements for obtaining the incentive payments.  The terms of the relevant contracts leave no room for Sims' position.  It was required to obtain and keep the relevant Consumer Agreements according to these timelines.

It makes no difference that the underlying GM-Sims contract does not establish this deadline. General Motors offers many allowance and incentive programs, each designed to meet dynamic market conditions and business needs. To preserve flexibility, the contract incorporates the Incentive Manual by reference and says that it will be "amended from time to time." R. 1-1 at 35. Sims contractually bound itself to this arrangement and cannot undo the bargain now.

Resisting this conclusion, Sims argues that General Motors breached an implied covenant of good faith and that a jury, not a court, must assess the allegation. But Michigan contract law does not recognize such an independent cause of action. *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279–80 (Mich. Ct. App. 2003). It uses the principle of good faith to evaluate a party's established contractual obligations or statutory duties, not to create a freestanding right of action. *Gorman v. Am. Honda Motor Co., Inc.*, 839 N.W.2d 223, 233–35 (Mich. Ct. App. 2013).

As just shown, General Motors' actions matched its rights and responsibilities under the contract and were performed in good faith. The car maker acted honestly and in a commercially reasonable manner. It imposed the Consumer Agreement deadline to ensure the integrity of the incentive program and provided Sims with notice of the change. Confirming the point, Sims knew about the changes. Mr. Sims, owner and president of the Sims dealership, admitted that he requires his salespeople to consult the incentive bulletins regularly for appropriate policies and procedures. And he testified that, for the period at issue, they were able to determine the requirements of the incentive program. Even though the audit period ended on January 9, 2014, and the 30-day grace period was not issued until February 1, 2014, GM debited Sims only for those transactions that would have violated the more lenient standard. That was not the action of a manufacturer bent on unfairly squeezing each dollar out of a dealer.

Sims' invocation of *Littlejohn v. Parish*, 839 N.E.2d 49 (Ohio Ct. App. 2005), adds little. The state court overturned a grant of summary judgment on a breach of contract claim in which one party argued that the other had not acted in good faith. But *Littlejohn* does not establish that all breach of good faith allegations must be decided by a jury. It merely found a genuine issue of material fact as to whether a group of mortgagors and mortgagees had dealt reasonably with each other under Ohio contract law. *Id.* at 55. No such dispute of fact remains here, making General Motors entitled to judgment as a matter of law.

*Ohio Dealer Act.* Sims also seeks relief under the Ohio Dealer Act. Ohio Rev. Code Ch. 4517. Ohio, like many States, regulates the relationship between car manufacturers and dealers. The laws take aim at the disparity in bargaining power between manufacturers and dealers, protecting dealers from abusive requirements imposed unilaterally by manufacturers. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100–01 (1978). Where applicable, the Ohio Act overrides terms in franchise agreements that violate its protections. Ohio Rev. Code § 4517.59(A).

Sims relies primarily on § 4517.59(A)(20)(a) of the Act, which identifies permissible and impermissible charge backs. On the green-light side of the Act, a manufacturer may reduce a sales incentive if it shows that the claim "lacks material documentation or is false, fraudulent, or a misrepresentation." *Id.* § 4517.59(A)(20)(a). On the red-light side of the Act, a manufacturer may not issue a chargeback due to a dealer's "incidental failure to comply with a specific claim processing requirement, such as a clerical error, that does not put into question the legitimacy of the claim." *Id.* Sims maintains that General Motors' reduction of its sales incentive payments falls on the impermissible side of this line.

No one claims that Sims was engaged in fraud or anything like it. The question, then, is whether General Motors' requirements with respect to Consumer Agreements and the timing of obtaining them amount to "material documentation."

Context allows us to eliminate one possibility for identifying "material documentation" requirements imposed by a car manufacturer. A requirement is not material simply because a manufacturer opts to put it in a contract. The animating point of the Ohio Dealer Act, and like-minded laws enacted in other States, is to *override* some contractual terms imposed by car makers. That's why the law nullifies terms in a car dealer contract that violate the law. *Id.* § 4517.59(A). That objective could *never* be accomplished if a car maker's decision to include a requirement in a contract automatically made it a "material" obligation. Were it otherwise, General Motors could have required all Consumer Agreements to be printed in 10-point, Times New Roman font and claimed that a dealer lacked "material documentation" if the agreements were printed in 11-point or Arial font. That's precisely the kind of pretextual and abusive hurdle that the Ohio legislature sought to prevent car makers from unfairly imposing on car dealers.

Confirming the point is the provision's later reference to a car dealer's "incidental failure to comply with a specific claim processing requirement, such as a clerical error, that does not put into question the legitimacy of the claim." *Id.* § 4517.59(A)(20)(a). A requirement thus is not "material" if it is "incidental" in nature, mirrors a "clerical error," and could never affect the "legitimacy of the claim."

Having established that a "material" requirement is not whatever a car manufacturer says it is, we must decide what it is. The definition of "material" is a good place to start. In everyday English, a timing requirement is material if it is "significant, important, [or] of consequence." Oxford English Dictionary (3d ed. online version 2017).

The General Motors' requirements were significant and important. Jeffrey Watts, the Director of Dealer Mediations for General Motors, stated that the company established the deadline for two business reasons. The first was that the deadline would prevent "abuse or potential abuse" and protect the integrity of the incentive program. This is a reasonable explanation. It is more difficult for an ineligible purchaser to obtain a General Motors authorization number from a friend or an acquaintance if he must produce it at the time of the vehicle's delivery *and* at the same time complete paperwork showing his eligibility for the program, rather than being permitted to do so months or even years after the fact. The longer the window of opportunity for providing the paperwork, General Motors appreciated, the more susceptible the incentive program is to abuse. That objective seeks to avoid abuse, not to impose it on dealers.

The second explanation was that the deadline would promote good relations with customers by eliminating the risk of having to pester them for documentation months after a sale. This too comports with lived experience. Just as no one enjoys receiving a residual cable or utilities bill for a negligible amount months after moving somewhere else, no one enjoys receiving a latent request for paperwork with respect to an already completed purchase. Sims carries the Buick and GMC brand in its name and sells Buick and GMC vehicles. If a customer is apt to hold McDonald's (not just the franchisee) responsible for an order of stale fries, so a purchaser would connect General Motors (not just the dealer) with a nettlesome voice mail demanding paperwork six months after the car purchase.

These legitimate business explanations suffice to show that a timely filed Consumer Agreement constitutes "material documentation" and did not amount to an "incidental failure to comply with a specific claim processing requirement, such as a clerical error." It's not as if General Motors docked Sims because a clerk placed the Consumer Agreements in the wrong deal folder. It required that the dealer obtain the necessary paperwork—confirming above all that this purchaser was entitled to this employee/family discount—soon after the buyer drove the car off the lot. The longer an illegitimate buyer has the car, the harder it will be to undo the transaction or recover the full value of the car.

Sims points out that remedial laws "shall be liberally construed in order to promote their object," and this principle has been applied to other parts of the Act. Ohio Rev. Code § 1.11; *see Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 598 N.E.2d 1187, 1193 (Ohio Ct. App. 1991). That is true. But that principle does not allow us to alter the conventional meaning of a statute's terms or for that matter to label a requirement immaterial when it is not. Giving effect to a statute's language is usually the best way to "promote [its] object." *See In re Carter*, 553 F.3d 979, 985–86 (6th Cir. 2009). That's all we are trying to do here.

Sims and the Ohio Automobile Dealers Association, as *amicus curiae*, emphasize that the statute uses the present tense, rather than the past tense, when it says "lacks material documentation." For this reason, they say, General Motors could not show that Sims "lacks material documentation" for these transactions because Sims had collected all of the Consumer Agreements by the time the audit was done. But that is verbal gymnastics—and question begging gymnastics at that. We could just as easily say that Sims continues to lack material documentation at the time of the audit, and indeed forever, if we understand the documentation at issue to be timely executed Consumer Agreements.

Sims' essential point is that the Ohio Act prohibits charge backs for any errors that it cures before the conclusion of an audit. The statute, it is true, refers to requirements that go to the "legitimacy of the claim." But, if accepted, this argument would mean that car makers could never enforce a documentation time deadline or for that matter any sort of prophylactic rule. The Act allows the manufacturer to conduct an audit at any time within twelve months after the date the dealer submits a claim. Ohio Rev. Code § 4517.59(A)(18). But Sims' interpretation would

force General Motors to conduct audits every month to enforce a 30-day deadline in this way. And imagine how difficult it would be to enforce a time-of-delivery deadline. The argument exceeds the statute's grasp.

Sims points us to a case from a Pennsylvania state court and an order from a Pennsylvania state agency. *See Volkswagen of Am., Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 840 A.2d 479 (Pa. Commw. Ct. 2004); *Lieberth & Sons Dodge, Inc. v. DaimlerChrysler Motors Co., LLC*, Pa. State Bd. of Vehicle Mfrs., Dealers and Salespersons File No. 2005-60-01503 (Mar. 24, 2006). But these cases arise under § 818.9(e)(2) of Pennsylvania's Board of Vehicles Act, which permits manufacturers to charge back only for "false or unsubstantiated claims." 63 Pa. Stat. Ann. § 818.9(e)(2). That's not what this statute says. Section 4517.59(A)(20)(a) permits charge backs when the claim is "false, fraudulent, or a misrepresentation" *or* "lacks material documentation."

We can make quick work of Sims' other statutory claims. Sims argues that General Motors' charge back violated § 4517.59(A)(19), which requires the manufacturer to approve or disapprove each incentive claim by the dealer within thirty days of receipt. But it is undisputed that General Motors made its initial incentive claim payments within thirty days of receipt. It just debited Sims' account for a portion of that amount after the audit. This is precisely the sequence of events that § 4517.59(A)(20) contemplates in addressing the circumstances under which a manufacturer may charge back a dealer's account. To read (A)(19) as Sims suggests would render (A)(20) meaningless.

Sims adds that General Motors violated § 4517.59(A)(1), which requires the manufacturer to act in good faith in its interactions with the dealer. Good faith is defined in the Act as "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade." Ohio Rev. Code § 4517.01(AA). This claim fails as we have already established that General Motors conducted itself in an honest and reasonable manner.

Sims adds one thing more—that the district court should have certified the meaning of the Act to the Ohio Supreme Court. We review this decision for an abuse of discretion.

*Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 449–50 (6th Cir. 2009). Although the Ohio Supreme Court has never interpreted these provisions of the Act, sufficient Ohio contract and statutory interpretation precedent guided its reasoned decision. Certification is disfavored in any event when the party, as here, makes the request after the district court has already decided the issue against it. *Id.* at 450.

For these reasons, we affirm.

_____

**DISSENT**

_____

ROGERS, Circuit Judge, dissenting.   Exactly for the reasons given by the majority, a documentation requirement imposed by a car manufacturer is not material under the Ohio Dealer Act, Ohio Rev. Code § 4517.59(A)(20)(a), "simply because a manufacturer opts to put it in a contract."  Maj. Op. at 6.  Likewise, the majority's test of "significance or importance" makes good sense.  Such a test serves the balance established in the Act of permitting a manufacturer to impose requirements reasonably related to the manufacturer's interests, while not allowing requirements that serve primarily the oppressive purpose of justifying chargebacks.  Summary judgment was not warranted, however, on the application of the test to the facts of this case.

The timing requirement imposed by GM is not a deadline for getting the paperwork to GM, but rather a deadline that GM requires the *dealer* to impose on the customer.  There is no argument here that how long a purchaser takes to give the required document to the dealer at all affects the timing of *GM's* processing of the paperwork.  The only two bases in the record for the requirement are reflected in a paragraph from an affidavit of GM's employee Jeffrey Watts:

> The change in the timing requirement was made in 2012 in response to abuse or potential abuse to GM's incentive system that GM discovered.  When a vehicle is delivered under the program without the completed required CDA, eligibility for the VPP incentive is at risk.  Mitigation of that risk is entirely within the dealer's control because the dealer can work with the customer to obtain the required documentation.  Having a defined "deadline" for obtaining the CDAs also promotes relationships with customers by ensuring that dealers promptly complete all required documentation and avoids having delays and potentially upsetting customers if dealers have to track down customers for documentation months after a sale.

The reference to "abuse or potential abuse" gives no indication how a timing requirement will prevent abuse.  The majority independently provides a "prophylactic" theory for the manufacturer's abuse contention: by denying chargebacks where the customer had more time to obtain the required documentation, it will be harder for purchasers to obtain the required document illegitimately.  But there is nothing in the record to indicate that it takes longer to get an illegitimate document than to get a legitimate one, particularly when the purchaser decides

when to first walk into the dealership. Assessing the validity of a policy based upon a court's ability to come up with some possible justification for it also smacks of rational basis review under the Equal Protection Clause, rather than the enforcement of a remedial statute like the one here, designed to protect dealers from manufacturer oppression. *See Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 598 N.E.2d 1187, 1193 (Ohio Ct. App. 1991).

The other justification for the timing requirement that GM requires dealers to impose is that customers will be upset by having more rather than less time to provide the needed documentation. This sounds at best like an after-the-fact rationalization rather than a genuine concern.

Conclusive acceptance of such weak rationales as significant or important effectively reads the protection against petty chargebacks out of the statute. Similar rationales could be spun for the font requirement that the majority correctly gives as a paradigmatic example of a contract requirement that would not be material under the Dealer Act. A larger font would permit the document to be read more easily, or might convey seriousness rather than frivolity. Such rationales would not be irrational, but they would not meet the materiality requirement that would justify making the dealer bear the cost of the incentives offered by the manufacturer.

In short, the dealer in this case has presented a genuine issue of material fact as to whether the timing requirement was not material. Accepting the flimsy rationales of the manufacturer in this case, without more, unduly undermines the protections of the Ohio Dealer Act. On this point I respectfully dissent. In all other respects, I agree with the majority opinion.