**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0285n.06

**No. 18-3653**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 31, 2019
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| US HF CELLULAR COMMUNICATIONS, LLC, et al., | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES |
| | ) DISTRICT COURT FOR |
| SCOTTSDALE INSURANCE COMPANY, | ) THE SOUTHERN |
| | ) DISTRICT OF OHIO |
| Defendant-Appellee. | ) |
| | ) |

BEFORE: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.

GRIFFIN, Circuit Judge.

This is a lawsuit about a lawsuit. Plaintiffs purchased four directors and officers liability insurance policies from defendant, who refused to defend them in a lawsuit in accordance with the policies. It claimed that they failed to timely report the lawsuit as required under most of the policies, and that one of the insurance applications they submitted contained a material misrepresentation that voided coverage in another. Plaintiffs then brought this action alleging breach of contract and bad faith. The district court granted summary judgment in defendant's favor. We affirm.

I.

A.

Plaintiffs are four interrelated limited liability companies: US HF Cellular Communications, LLC ("USHFCC"); Virsenet, LLC; ShipCom, LLC; and Global Wideband HF

Net LLC ("Global"). Virsenet owned USHFCC in its entirety, and USHFCC in turn owned 80% of ShipCom. All four plaintiffs operated out of the same office in Laguna Beach, California, and shared the same office manager. Relevant to this appeal, Edward Bayuk was, at various points, a "director" of USHFCC, the "manager" of USHFCC, a "director" of Global, and the "manager" of ShipCom. Jon Richmond was the chief operating officer ("COO") of USHFCC, chief executive officer ("CEO") of ShipCom, and COO of Global.

ShipCom operated a maritime communications network, using high frequency ("HF") radio waves, in Mobile, Alabama. As a Delaware Chancellor summarized in related litigation,

> In early 2012, [USHFCC] acquired an 80% interest in ShipCom . . . in order to capture value inherent in a waiver ShipCom had recently obtained from the Federal Communications Commission (the "Waiver"), which allowed ShipCom to use a particular maritime frequency spectrum, typically restricted to maritime use, for emergency land-based communications. The Waiver was granted exclusively to ShipCom and, by all accounts, it is quite valuable.

*US HF Cellular Commc'ns, LLC v. Stiegler*, No. CV 11363-VCS, 2017 WL 4548461, at *1 (Del. Ch. Oct. 12, 2017) (footnotes omitted). ShipCom's founders, Robert S. Block and Rene Stiegler, III, retained the remaining ownership interest in ShipCom. *Id.*

"All was well at ShipCom until May 2015, when Block and Stiegler discovered that [USHFCC] was making plans to exploit the Waiver outside of ShipCom and to exclude them from the potential profits. They filed suit . . . alleging various tort theories" in the Circuit Court of Mobile County, Alabama. *Id. See Stiegler v. ShipCom, LLC*, No. 2-CV-2015-901469 (Ala. Cir. Ct.) (the "Alabama lawsuit"). Block and Stiegler named USHFCC, ShipCom, Virsenet, and Bayuk as defendants in the original complaint, serving them between June 10 and June 17 of 2015. They subsequently added Richmond as a defendant, serving him on December 8, 2015.

The third amended complaint added Global as a defendant, and it was served on April 14, 2016. The allegations against Global stemmed from its purchase of Globe Wireless Radio Services

Inc., a direct competitor of ShipCom, and its subsequent "Network Management Agreement" with USHFCC and ShipCom. According to Block and Stiegler, that agreement "transferred to Global 325 ShipCom [high frequency radio] Channels purchased for ShipCom after USHFCC acquired its 80% interest in ShipCom." The complaint alleged that this arrangement—and the direct competition between Global and ShipCom that it created—constituted a conflict of interest, self-dealing, excessive compensation, usurpation of ShipCom's corporate opportunity, and "breach of fiduciary duties of loyalty, due care[,] and good faith and fair dealing."

B.

Like many businesses, plaintiffs carried "business and management indemnity" insurance for situations like this. This type of insurance is often called "directors and officers" or "D&O" insurance. *See Telxon Corp. v. Fed. Ins. Co.*, 309 F.3d 386, 387 (6th Cir. 2002). It typically provides direct coverage to the directors and officers of a business entity for legal claims brought against them and "coverage to the insured company to the extent that it is permitted or required to indemnify the directors and officers." 23-146 *Appleman on Insurance Law & Practice Archive* § 146.2(B)(1). The four policies at issue here provided these types of coverage, along with direct coverage to the entities themselves.

Plaintiffs purchased the policies from defendant, Scottsdale Insurance Company, a wholly owned subsidiary of Nationwide Mutual Insurance Company. Scottsdale issued the policies as a "surplus-lines" insurer. "Surplus lines" or "excess lines" insurance is "[i]nsurance with an insurer that is not licensed to transact business within the state where the risk is located." *Black's Law Dictionary* 925 (10th ed. 2014). It is "often a source of last resort for the placement of liability or property insurance on unusual risks . . . that do not fall within the general parameters of traditional markets." 1-2 *Appleman on Insurance Law & Practice Archive* § 2.17 (2d ed. 2011). Plaintiffs

were located, for the most part, in California, and Scottsdale was not licensed to sell insurance there directly. So, Scottsdale instead issued the policies through its New Jersey-based underwriting manager, E-Risk Services, LLC ("E-Risk").

USHFCC purchased three consecutive yearlong policies from Scottsdale, with coverage beginning on July 31, 2013 (collectively, the "US HF Policies"). They covered USHFCC, Virsenet, and ShipCom. Prior to obtaining coverage, USHFCC submitted an application for the first policy and later, a renewal application for each of the other two.[1] Bayuk filled out all three applications. Scottsdale also issued a business and management indemnity policy to Global and Terlingua, LLC, which owned 60% of Global, for 2015–16 (the "Global Policy"). Bayuk completed the application for that policy as well. All the applications were incorporated into the policies once they were issued.

On January 8, 2016, USHFCC notified Scottsdale of the Alabama lawsuit. Scottsdale denied coverage under the US HF Policies later that month, invoking a clause that required any claims to be reported to it "in no event later than sixty (60) days after the end of the Policy Period." The previous policy period had ended on July 31, 2015. Global reported the lawsuit on October 11, 2016, and Scottsdale denied coverage under the Global Policy two months later.[2] Ultimately, Scottsdale did not defend or pay for the defense of plaintiffs or any of their officers, directors, or employees in the Alabama lawsuit.

---

[1]USHFCC, Virsenet, and ShipCom were listed under "Name of Parent Company" in the original and first renewal application. In the second renewal application, in which the form was slightly different, Global and Terlingua, LLC were also listed under "Name of Applicant."

[2]While the parties have stipulated that Scottsdale denied coverage and sent letters to plaintiffs on the dates discussed, they did not make these letters a part of the record below, so it is not clear what reason Scottsdale gave at the time for denying coverage under the Global Policy.

C.

Plaintiffs sued Scottsdale in the United States District Court for the Southern District of Ohio, alleging breach of contract under the US HF and Global Policies and breach of the implied covenant of good faith and fair dealing. They also sought declaratory relief. After the parties submitted their Rule 26(f) report, the magistrate judge entered a preliminary pretrial order setting several deadlines and directing discovery. Over plaintiffs' objection, the magistrate judge limited discovery only to the issue of coverage, precluding the parties from taking discovery solely related to the bad-faith claims. The parties eventually stipulated to several facts, and the authenticity and accuracy of several documents.

Following discovery, Scottsdale moved for summary judgment, while plaintiffs filed two separate motions for partial summary judgment—one by Global and one by USHFCC, Virsenet, and ShipCom. The district court denied plaintiffs' motions and granted Scottsdale's. *US HF Cellular Commc'ns, LLC v. Scottsdale Ins. Co.*, No. 2:17-CV-261, 2018 WL 2938388, at *1 (S.D. Ohio June 12, 2018) (hereinafter "*USHFCC*"). The court found that USHFCC, Virsenet, and ShipCom failed to timely report the Alabama lawsuit to Scottsdale, "which is a condition precedent" to coverage under the US HF Policies. *Id.* at *10. As for the Global Policy, the district court determined that a material misrepresentation contained in Global's insurance application applied to bar coverage. *Id.* at *11–12. On appeal, plaintiffs challenge the denial of their motions for partial summary judgment, the grant of defendant's motion for summary judgment, and the magistrate judge's limitation of discovery in the preliminary pretrial order.

II.

We review de novo the district court's rulings on the motions for summary judgment. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the evidence in a light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

Before tackling the merits, we address the parties' choice-of-law dispute. The policies do not specify which state's substantive law applies. Plaintiffs argue that Ohio law should apply, while Scottsdale argues that California law should apply. After observing that this was "a difficult case and a close call," the district court found that California law applied and that "Ohio does not have a significant interest in this case." *USHFCC*, 2018 WL 2938388, at *9. "We review the district court's choice of law decision de novo." *Northland Ins. Co. v. Guardsman Prod., Inc.*, 141 F.3d 612, 616 (6th Cir. 1998).

"In a diversity case, we apply the choice-of-law principles of the forum State, here Ohio." *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 185 (6th Cir. 2017). The Ohio Supreme Court has adopted § 188 of the Second Restatement of Conflict of Laws. *See Nationwide Mut. Ins. Co. v. Ferrin*, 487 N.E.2d 568, 569 (Ohio 1986) (per curiam). It provides, in relevant part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188 (1971) (hereinafter "Restatement").

"Underlying the factors set forth in section 188 are the principles enunciated in section 6 of the Restatement." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 605 (6th Cir. 1996). It provides as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement at § 6.

Several factors lean toward neither California nor Ohio.[3] The Alabama lawsuit was located (unsurprisingly) in Alabama, which is where plaintiffs requested that Scottsdale defend them. At the summary judgment hearing, plaintiffs' counsel stated that, other than Bayuk and Richmond, "[t]he rest of my clients are -- the natural persons reside in New York, one in Connecticut kind of spread between New York and Connecticut." Plaintiffs also have a connection to Delaware, where some of them were formed, and Block and Stiegler served USHFCC and Virsenet there through their registered agents. They served ShipCom in Mobile, Alabama. The 2015–16 US HF Policy lists USHFCC as having a mailing address in Oklahoma. The underwriting agent for the policies, E-Risk, is located in New Jersey. The US HF Policies provided that notices of claims and other notices should be sent to Scottsdale at an address in New York City. And Scottsdale's principal place of business—as specifically alleged in plaintiffs' complaint—is in Arizona. Also, the policies provide that "[c]overage under this Policy shall extend to Wrongful Acts taking place or Claims made anywhere in the world," which does not help to narrow it down.

There are some connections to Ohio, namely, it being Scottsdale's state of incorporation. Plaintiffs put great weight on the policies' listing of an address in Columbus, Ohio as Scottsdale's "Home Office," while having previously acknowledged that its principal place of business is in Arizona. By all accounts, Scottsdale is licensed to do business in Ohio and indeed does conduct business there. Plaintiffs also emphasize that Scottsdale's parent company, Nationwide Mutual

---

[3]As the district court correctly noted, several of the factors are of little help as applied to this case. For example, "'the place of contracting is a relatively insignificant contact' and the place of negotiation 'is less importan[t] when there is no one single place of negotiation and agreement, as for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.'" *USHFCC*, 2018 WL 2938388, at \*7 (quoting Restatement at § 188 cmt. e). Here the parties did just that, via email.

Insurance Company, is based in Ohio. But this carries little weight because Nationwide is not a party in this lawsuit, nor is it otherwise involved in the case.

California's connections, in contrast, are more significant in both quality and quantity. Bayuk and Richmond, plaintiffs' corporate officers, resided in California. When asked to list the applicants' addresses in the insurance applications, Bayuk provided the Laguna Beach, California address in each one, for all four plaintiffs. The policies themselves listed USHFCC's "Principal Address" as being in California, and the "Civil Cover Sheet" to the complaint in this lawsuit listed Orange County, California as its "County of Resident." Plaintiffs shared an office manager, who worked out of that same office on their behalf. Additionally, "[a] D&O insurance policy is a unilateral contract—the insured has already performed by paying the premium in exchange for the insurance company's promise to provide insurance." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 599–600 (6th Cir. 2004). Plaintiffs' counsel admitted at the summary judgment hearing that "the premium emanated from California initially."

The weight of these connections to California notwithstanding, plaintiffs make a novel argument based on the type of insurance at issue here. They highlight that Scottsdale was a surplus-lines insurance carrier in California and not licensed to transact business there directly. Plaintiffs assert that "[i]t stands public policy on its head to let a surplus lines insurer escape its responsibilities by borrowing the law of a state where it chose not to do business and subject itself to regulation." But plaintiffs cite no authority in support of this argument. Moreover, Scottsdale did not "avoid[] regulation by California" entirely, as plaintiffs claim. As with other types of insurance, California regulates surplus lines insurance, and Scottsdale is required to follow California law in order to issue surplus lines policies to Californians. *See* Cal. Ins. Code § 1761.

For example, surplus lines insurance premiums in California are subject to a three percent tax. *Silvers v. Bd. of Equalization*, 116 Cal. Rptr. 3d 355, 357 (Cal. Ct. App. 2010).

Beyond that, the policies include a "California Policyholder Notice," listing the address and phone number of the California Department of Insurance's Consumer Affair Unit, and a "California Surplus Lines Notice . . . to California Insured" informing the insureds of the risks involved in purchasing surplus lines insurance. The 2015–16 US HF Policy includes a supplement titled "Amendatory Endorsement – California." Additionally, the policies make clear that plaintiffs agreed that the "Commissioner of Insurance" in San Francisco, California, "is authorized and directed to accept service of process on [their] behalf," and after doing so, "mail the process or a true copy to" one Phyllis Thompson of "Trans Cal Associates," located in Sacramento. While plaintiffs contend that "[t]he only reasonable inference for a policyholder to draw from reading the [US HF] Policies is to assume they were made and performable in Ohio," that statement fails to persuade when "California" is plastered all over the policies.

California's relevant contacts under the Restatement are considerably stronger and more numerous than Ohio's in this case, and we agree with the district court's determination that California law applies.

IV.

Turning to the merits, we address the US HF Policies first. "Insurance policies are construed under the same rules that govern the interpretation of other contracts. Accordingly, [a] policy must be interpreted to give effect to the mutual intent of the parties at the time of contracting, and such intent is ascertained, if possible, from the clear and explicit language of the contract." *St. Paul Mercury Ins. Co. v. Frontier Pac. Ins. Co.*, 4 Cal. Rptr. 3d 416, 424 (Cal. Ct. App. 2003) (internal quotation marks omitted), *as modified on denial of reh'g* (Aug. 28, 2003). "[C]ourts must

interpret contracts as a whole and in a manner that does not render any clause or provision superfluous." *Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F. Supp. 3d 1156, 1164 (S.D. Cal. 2015); *see R.W.L. Enters. v. Oldcastle, Inc.*, 226 Cal. Rptr. 3d 677, 682 (Cal. Ct. App. 2017). Additionally, "[a]n insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." *Nat'l Ins. Underwriters v. Carter*, 551 P.2d 362, 366 (Cal. 1976) (citation omitted); *see Pac. Emp'rs Ins. Co. v. Superior Court*, 270 Cal. Rptr. 779, 784 (Cal. Ct. App. 1990).

As the district court observed, "[t]here is no dispute that the type of claims at issue would be covered under the US HF Policies if they were made after the inception of the policies, timely reported, and not barred by any exclusion." *USHFCC*, 2018 WL 2938388, at *10. Scottsdale denied coverage under the policies primarily because USHFCC, Virsenet, and ShipCom failed to timely report the Alabama lawsuit, and the district court granted summary judgment in favor of Scottsdale for this reason. *Id.* at *10–11. The relevant language from the policies provides that "[t]he Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give Insurer written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after the end of the Policy Period." The policies provide several definitions of the word "Claim." They include a "written demand against any Insured for monetary damages or non-monetary or injunctive relief" and "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading." "A Claim shall be deemed to have been first made against the Insureds on the date an Insured who is an executive officer, director or general counsel becomes aware of such Claim."

The US HF Policies are "claims-made-and-reported" policies, which require "a claim to be *made* against the insured during the specified policy period" and "that a claim be *reported* [to the

insurer] during the policy period." *PIMG, Inc. v. Carolina Cas. Ins. Co.*, No. 09-CV-2022 BEN (CAB), 2010 WL 11594809, at *3 (S.D. Cal. Mar. 5, 2010) (emphases added); *see Centurion Med. Liab. Protective Risk Retention Grp. Inc. v. Gonzalez*, 296 F. Supp. 3d 1212, 1217 (C.D. Cal. 2017). California law distinguishes claims-made-and-reported policies from "occurrence policies, in which coverage is triggered by events that occur within the policy period, even if they lead to claims years after the policy period." *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 955 (9th Cir. 2002) (emphasis omitted). Here, the policy language makes clear that the reporting requirement is "a condition precedent" to coverage. "A condition precedent refers to an act, condition or event that must occur before the insurance contract becomes effective or binding on the parties." *N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 99 Cal. Rptr. 3d 225, 240 (Cal. Ct. App. 2009) (emphasis omitted).

Plaintiffs advance multiple arguments seeking to excuse their untimely reporting of the Alabama lawsuit. First, each policy included a "Continuity Date" of July 31, 2013.[4] According to plaintiffs, "[t]his means the Insured reasonably expects long-tail coverage for claims made and reported after the Continuity Date so long as the insured maintains coverage with the same insurance company." Second, plaintiffs cite the policies' definitions of the words "Policy" and "Application" for the proposition "that the Parties intended the renewal policy to simply extend the expiration date of the earlier policies." "Policy" is defined as "collectively, the Declarations, the Application, this policy form and any endorsements," and "application" means

> all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the Insureds to the Insurer in connection with the Insurer underwriting this Policy or any policy of which this Policy is a renewal

---

[4]The policies unhelpfully define this term as "the date set forth in Item 3. of the Declarations relating to this Coverage Section."

or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this Policy.

Because all previous applications were incorporated into each policy as a whole, plaintiffs argue that it is reasonable to expect that the policy's renewal would also incorporate the coverage of previous policies, "and would therefore permit the reporting of a Claim during the last [US HF] Policy for claims arising earlier."

Plaintiffs thus contend that the two renewals of the original policy created continuous coverage spanning across all three. But "courts have consistently recognized that, absent an agreement to the contrary, the renewal of a policy does not extend a policy's reporting period." *PIMG, Inc.*, 2010 WL 11594809, at *2 (collecting authority). And plaintiffs' argument does not square with the Policies' plain language. Each policy has a specific "Policy Period," which "means the period from the effective date and hour of the inception of this Policy to the Policy expiration date and hour as set forth" on the first page of each policy. For example, the second policy provided: "Policy Period: From 7/31/2014 to 7/31/2015 12:01 A.M. local time at Principal Address shown above." All three policies contain the same language requiring that plaintiffs report the existence of any claim "in no event later than sixty (60) days after the end of the Policy Period." And each policy defines its "Policy Period" differently, resulting in separate reporting periods with separate deadlines for timely reporting claims under each policy. This indicates that coverage under each policy is discrete and not continuous.

Moreover, when the policies mean to discuss the effects of renewals, previous policies, and future policies, they do so explicitly. For example, the 2014–15 and 2015–16 Policies each have a "Renewal N[umber]" listed on the first page. The policies also contain a clause excluding from coverage any claim involving "any Wrongful Act, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this Policy is a renewal or

replacement or which it succeeds in time." And while plaintiffs point out that each policy contains

the same "Continuity Date" of July 31, 2013, the policies use that term to limit their coverage, not

extend or connect it. The policies exclude from coverage any claim involving "any prior or

pending litigation or administrative or regulatory proceeding, demand letter or formal or informal

governmental investigation or inquiry filed or pending on or before the Continuity Date."

The policies' plain language thus precludes plaintiffs from seeking coverage related to the

Alabama lawsuit because they failed to timely report it to Scottsdale. Plaintiffs request that we

rewrite the policies rather than give effect to the parties' intent therein. This is not well taken.[5]

For these reasons, we agree that the late-notice exclusion applies here to bar coverage for claims

related to the Alabama lawsuit. Accordingly, we affirm the district court's grant of summary

judgment in favor of Scottsdale with respect to the US HF Policies.

V.

We now address the Global Policy. The district court granted summary judgment in favor

of Scottsdale with respect to the Global Policy after finding that its "Application Exclusion" barred

coverage for the Alabama lawsuit. *USHFCC*, 2018 WL 2938388, at *11. Specifically, the Global

Policy contained the following language:

> In the event the Application, including materials submitted or required to be
> submitted therewith, contains any misrepresentation or omission made with the
> intent to deceive, or contains *any misrepresentation or omission which materially
> affects either the acceptance of the risk or the hazard assumed by the Insurer under*

---

[5]Plaintiffs raise several other arguments attacking the late-notice exclusion's application. They argue that (1) their failure to timely report the Alabama lawsuit to Scottsdale was not a material breach of the policy because Scottsdale gave an additional reason for denying coverage, (2) there was no prejudice to Scottsdale caused by any late reporting, and (3) that Scottsdale should have defended Global under the US HF Policies, as Global was added onto the 2015–16 Policy. But plaintiffs forfeited these arguments by raising them, respectively, for the first time on appeal, in reply, and at oral argument. *See United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009); *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006); *United States v. Jenkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989).

*this Policy*, this Policy, including each and all Coverage Sections, *shall not afford coverage* to the following Insureds for any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

    a.    any Insured who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the Application, such materials, or this Policy;

    b.    any Company or Sponsor Company to the extent it indemnifies any Insured referred to in subsection a. above; and

    c.    any Company, Sponsor Company, Plan, Employee Benefit Plan, or any other entity that is an Insured, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the Parent Company knew the facts misrepresented or the omissions, whether or not such individual knew of the Application, such materials, or this Policy.

With respect to any statement, representation or information contained in the Application, or in the materials submitted or required to be submitted therewith, and solely with respect to the above exclusion, no knowledge possessed by any Insured who is a natural person shall be imputed to any other Insured who is a natural person.

(Emphases added).

Bayuk executed the application for the Global Policy on August 25, 2015. The application asked the following question:

Within the last three (3) years, has the Applicant or any person proposed for this insurance in his or her capacity as an employee, officer, or director of the Applicant or another entity been the subject of or involved in any:

a.    litigation, civil, arbitration, administrative or criminal proceeding, civil or criminal charge or hearing, or a written demand seeking monetary or non-monetary damages?

Bayuk checked the box labeled "Yes" next to this "prior litigation question." Six days later, Bayuk executed a revised application on behalf of Global, this time checking the box labeled "No" next to that question.[6]

According to Scottsdale, this changed answer was a material misrepresentation because by the time Bayuk submitted the revised application—in late August of 2015—Block and Stiegler had already filed their original complaint, named Bayuk, USHFCC, Virsenet, and ShipCom as defendants, and served all of them. In addition to receiving notice of the lawsuit by service of the complaint, Bayuk attended a meeting of USHFCC's board of directors on July 23, 2015, during which Richmond "updated the Board on the status of the litigation commenced against the Company and others by Bob Block and Rene Stiegler and the recommendations of the Company's counsel as to the Company's response thereto." Thus, Scottsdale contends that Bayuk also had actual knowledge of the Alabama lawsuit when he executed the revised application. Global resists this on multiple fronts.

A.

Global argues that the prior litigation question is ambiguous and states that the ambiguities in an insurance policy are resolved against the insurer in favor of the insured. Specifically, Global notes that the term "another entity" (which appears in that question) is not defined in the policy and asserts that "[i]t is entirely reasonable to read the Prior Litigation Question as asking about entities applying for insurance." Only Global and Terlingua, LLC were applying for insurance here, and they had not yet been sued in the Alabama lawsuit, so under Global's reading, the "No"

---

[6]In its reply brief, Global asserts that "Mr. Bayuk answered 'yes' because he had been sued, but someone (possibly, the broker) changed the answer to 'no'", apparently forgetting it had previously stipulated that "Mr. Bayuk executed a revised Application for Business and Management Indemnity Insurance on behalf of Global Wideband and Terlingua LLC dated August 25, 2015."

answer would have been truthful. The district court rejected this interpretation because it "would render the addition of 'another entity' superfluous—'another entity' would always fall under the 'Applicant' umbrella." *Id.*

Global responds that this is not necessarily the case because "there are entities which would be relevant to coverage that do not fall within the definition of Applicant." Here, Global notes that the policy also provided coverage related to "Outside Entities," which are defined as "any non-profit [and tax-exempt] company . . . in which any of the Directors and Officers is a director, officer, trustee, governor, executive director or similar position of such non-profit company" or "any other company specifically identified by endorsement to this Policy." Because "the Global Policy contemplates coverage for directors and officers in their capacity as such for entities aside from the Applicant," Global claims that interpreting the term "another entity" to mean "other entities applying for insurance" does not render it superfluous.

This interpretation breaks down when viewing the prior litigation question "in the context of the policy as a whole." *See St. Paul Mercury Ins. Co.*, 4 Cal. Rptr. 3d at 424. The Global Policy provides a specific, detailed definition of the term "Outside Entities." It makes little sense for the policy to specifically define a term in this way and use that term throughout the policy, but then also refer to it by using a different, undefined term. If Scottsdale intended to limit the scope of the prior litigation question to cover only the applicant and "Outside Entities," "it surely could have used that term; its failure to do so suggests that it was referring to something else." *United States v. Oliveras*, 905 F.2d 623, 629–30 (2d Cir. 1990), *superseded by statute as stated in United States v. Mazza*, 503 F. App'x 9, 11 (2d Cir. 2012) (summary order). The district court interpreted the term "another entity" as "mean[ing] any other entity." *USHFCC*, 2018 WL 2938388, at *12. This

interpretation is the better one; it remains true to the plain meaning of the words and makes sense when viewed in context of the policy as a whole.

These contours of the prior litigation question's scope make sense because they home in on the type of information that would be relevant to an insurance company's decision of whether to issue a D&O policy. As the district court explained, "[i]f the insurer knows, for example, that one officer or director has a history of being sued for business-related actions at previous companies that employed him, the insurer may not want to insure the proposed insured company, for fear that the particular employees' [sic] actions will lead to another suit." *Id.* Any person who has seen his car insurance rates rise after being involved in a traffic accident understands this principle. This provides further support to the interpretation of "another entity" as "mean[ing] any other entity." Because the prior litigation question is not susceptible to more than one reasonable interpretation, it is not ambiguous as a matter of law.

### B.

Global also contends that Bayuk's revised answer of "No" was in fact truthful. At the time he executed the revised Global application, Block and Stiegler had sued Bayuk in his capacity as "managing member" of Virsenet and "purported manager" of ShipCom, but not as an "employee, officer, or director" as the prior litigation question asks. Only after the Global application's execution did Block and Stiegler sue Bayuk in his capacity as the "President of ShipCom" (in the second amended complaint), and as a "director" of USHFCC and Global (in the fourth amended complaint).

Scottsdale argues that Global forfeited this argument by not raising it in the district court. *Armstrong*, 432 F.3d at 699–700. Global does not dispute this failure, but rather attacks Scottsdale's argument as "hyper-technical" and declares that enforcing the forfeiture rule here

"would lead to a grossly inequitable result in a case where Scottsdale can show no adverse reliance." Global avers that "[w]ithout the submission of corporate formation documents, bylaws, or other documents, neither Scottsdale nor the district court had any evidence to conclude that a lawsuit against Mr. Bayuk in his capacity as a 'managing member' or 'manager' of Virsenet and ShipCom constituted a suit against Mr. Bayuk in his capacity as an 'employee, officer, or director' of an entity." Scottsdale responds that this is exactly the point, and that "[i]t would be particularly unjust to allow Appellants to first raise this issue on appeal and then simultaneously criticize Scottsdale for failing to introduce evidence probative to that issue or attempt to draw a negative inference from the lack of any record evidence on that issue."

We agree with Scottsdale. Entertaining Global's argument now would encourage the type of behavior that the forfeiture rule seeks to prevent. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[T]he rule ensures fairness to litigants by preventing surprise issues from appearing on appeal."). Thus, this is not the "rare case" in which a forfeiture should be excused. *Cf. Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677 (6th Cir. 2018).

C.

Next, Global argues that the "No" answer was not material. The Global Policy makes clear that the application exclusion only applies if the misrepresentation or omission was "made with the intent to deceive, or . . . materially affects either the acceptance of the risk or the hazard assumed by the Insurer under" the policy. Global insists that the district court's grant of summary judgment was inappropriate because "Scottsdale did not submit any evidence to establish that Scottsdale would not have accepted the risk or the hazard assumed by Scottsdale under the Global Policy but for the answer to the Prior Litigation Question in the second Global Application." Global also points out that Scottsdale had already decided to insure it under the 2015–16 US HF

Policy, and that Bayuk had been insured under all three US HF Policies. And the renewal applications for the 2014–15 and 2015–16 US HF Policies did not include a prior litigation question.[7] According to Global, because Bayuk and Global were already insured, the "No" answer could not have "materially affect[ed] either the acceptance of the risk or the hazard assumed by the Insurer under [the Global] Policy", and Scottsdale confirmed this belief by choosing not to ask about prior litigation in the renewal application that—for the first time—added Global to the US HF Policies.

The problem with Global's argument is that the Global Policy addresses materiality in explicit terms:

> By acceptance of this Policy, the Insureds agree that:
>
> 1.    *the statements in the Application are their representations*, that such representations *shall be deemed material* to the acceptance of the risk or the hazard assumed by Insurer under this Policy, and that this Policy and each Coverage Section are issued in reliance upon the truth of such representations; and
>
> 2.    in the event the Application, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by Insurer under this Policy, this Policy, including each and all Coverage Sections, *shall be void ab initio* with respect to any Insureds who had knowledge of such misrepresentation or omission.

(Emphases added). The district court held that this language controls and that the "No" answer to the prior litigation question was material because it was a statement made in the Global application. *USHFCC*, 2018 WL 2938388, at *12.

---

[7]The renewal application for the 2014–15 US HF Policy did ask whether, in the preceding five years, "the company [has] been subject to or suffered any losses or litigation from any" breach of security, technology or extortion threat, violation of privacy laws, or unauthorized use of personal information. But that question plays no role in this appeal.

Global attempts to dismiss this language by characterizing it as a "boiler plate recitation in the policy that everything submitted was material" and stating that "[c]alling a table a chair does not make it a chair". But an insurance policy "must be interpreted to give effect to the mutual intent of the parties at the time of contracting, and such intent is ascertained, if possible, from the clear and explicit language of the contract." *St. Paul Mercury Ins. Co.*, 4 Cal. Rptr. 3d at 425 (internal quotation marks omitted). This provision, under which the "No" answer to the prior litigation question falls, is about as "clear and explicit" as it gets. It controls here, and we enforce the parties' agreement that the statements in the Global application were material.

D.

Global also argues that the "No" answer is not sufficiently related to the claims alleged in the Alabama lawsuit's original complaint to trigger the application exclusion. The application exclusion applies only to claims "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations, or information" in the Global application. According to Global, this means "there must be a nexus between that misrepresentation and the Claim," and the Alabama lawsuit, as pleaded in the original complaint, "had nothing to do with Global." It neither mentioned Global by name nor accused it of any wrongdoing. Also, the claims against Global that eventually appeared in subsequent versions of the complaint differ considerably from those against USHFCC, Virsenet, and ShipCom. Global summarizes these differences in its brief:

> [The original complaint] in the Alabama Lawsuit focused on (1) an agreement with Intrado (which has nothing to do with the latter allegations made against Global), (2) an agreement with Rockwell Collins (which has nothing to do with the allegations made against Global, and (3) the ownership of the FCC waiver (which has nothing to with the Global Allegations). In contrast, allegations made relating to Global (as noted in the Third Amended Complaint) involve (1) the availability to ShipCom of the Globe transaction, (2) ShipCom's failure to consummate the Globe transaction, (3) the formation of Global, (4) Global's purchase of Globe and

its assets, and (5) subsequent agreements between Global and USHFCC or ShipCom relating to certain frequencies.

(Citations omitted).

Again, Global's argument is stymied by the policy's plain language. And this time, it is staggeringly broad. In order for the application exclusion to apply, it is enough if the claims for which coverage is sought "involv[e]" the relevant misrepresentation "*in any way.*" (Emphasis added). Here, the litigation that made Bayuk's "No" answer a misrepresentation is the very same litigation for which Global later sought coverage under the policy. Beyond that obvious connection, the claims present in the original complaint "involv[e]" Global and the subsequent claims against it much more than Global lets on. Both sets of allegations center on the same entity, ShipCom, and the alleged exploitation of its assets. Both allege conduct from around the same period, harm to the same plaintiffs, and wrongful acts by the same individuals. USHFCC and Global had identical membership on their boards, the same COO, and the same "counsel to the Company." They even conducted board meetings one right after the other on at least one occasion. Thus, these two sets of claims are not merely "involve[d]" "in any way"; they are deeply connected in several important respects.

What's more, Scottsdale points out that the first amended complaint in the Alabama lawsuit was filed twelve days before Bayuk executed the revised Global application. This version of the complaint did not add Global as a defendant, but it did explicitly mention Global and implicate Global in its allegations of breach of fiduciary duty, self-dealing, and usurpation of corporate opportunity against USHFCC, Virsenet, ShipCom, and Bayuk. This strengthens the connections between the claims against Global to those in the Alabama lawsuit's original complaint even further. For these reasons, we reject Global's "relatedness" argument.

E.

Global's brief mentions in passing that "the district court d[id] not explain how prior litigation against Mr. Bayuk (which did not involve Global) somehow taints coverage for [Block and Stiegler's] separate claims against [Global COO] Mr. Richmond, [Global directors] Mr. Jacobs, Mr. Amron, Mr. Whiteman, Mr. Braunstein, or Global itself." Global has likely forfeited this argument as well (by failing to raise it before the district court), but it is easily dispensed with on the merits. USHFCC's board of directors discussed the Alabama lawsuit on July 23, 2015. Edward Bayuk, Ray Whiteman, Joseph Jacobs, Arthur Amron, Phil Braunstein, Jon Richmond, and Wendy J. Schriber attended this meeting. Richmond, Jacobs, Amron, Braunstein, and Whiteman were eventually added to the Alabama lawsuit as defendants. The minutes from a meeting of Global's board of directors—which took place about an hour before the USHFCC board meeting—listed Bayuk, Jacobs, Amron, Braunstein, and Whiteman as board members of Global, and Jon Richmond as COO.

Because they attended the USHFCC board meeting, each of these individuals is imputed with knowledge of the Alabama lawsuit's existence as of July 23, 2015. The application exclusion applies to them in addition to Bayuk because they are "natural persons . . . who knew the facts misrepresented" by Bayuk in the revised Global application, *viz.*, that Bayuk had within the prior three years "been the subject of or involved in . . . litigation.". It does not matter "whether [they] knew of the Application, such materials, or [the Global] Policy." (Emphasis omitted). The exclusion also applies to Global both directly and "to the extent it indemnifie[d]" these individuals.

For these reasons, we affirm the district court's grant of summary judgment in favor of

Scottsdale with respect to the Global Policy. [8]

VI.

Finally, plaintiffs challenge the magistrate judge's limitation of discovery in its preliminary

pretrial order. We review this challenge for abuse of discretion. *Bentkowski v. Scene Magazine*,

637 F.3d 689, 696 (6th Cir. 2011). The order stated in relevant part:

> Defendant asks that discovery related to coverage issues proceed in advance of
> discovery related to the bad faith claim; Plaintiffs disagree with that request, taking
> the position that discovery on the issues may not be easily categorized. Having
> heard the arguments of counsel, the Court DIRECTS that discovery proceed at this
> juncture only on the issue of coverage. However, a discovery request will not be
> objectionable merely because it may relate to both the coverage issue and the bad
> faith claim. The party seeking such discovery must, in the face of objection, be
> able to establish the relevance of the proposed discovery to the issue of coverage.

The reason for directing that discovery proceed in this way is fairly straightforward. Recall that

"there can be no action for breach of the implied covenant of good faith and fair dealing" if there

is no duty to defend. *USHFCC*, 2018 WL 2938388, at *12. In other words, plaintiffs would have

to prevail on the issue of coverage for the bad faith claim to be viable, so taking discovery that

pertained only to bad faith early on in the litigation would be potentially unnecessary.

Plaintiffs argue that this order "seriously impaired the Insureds' ability to fully and fairly

develop the record on coverage and imposed a tremendous burden given the financial strain of

---

[8]To the extent that plaintiffs challenge the district court's grant of summary judgment in favor of Scottsdale with respect to their claims for breach of the implied covenant of good faith and fair dealing, this fails as well. The district court addressed it thus: "If there is 'no duty to defend under the terms of [an insurance] policy, there can be no action for breach of the implied covenant of good faith and fair dealing.'" *USHFCC*, 2018 WL 2938388, at *12 (quoting *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995), *as modified on denial of reh'g* (Oct. 26, 1995)). We agree that this ends the inquiry. This appeal also nominally challenges the district court's denial of plaintiffs' motions for partial summary judgment. Because they addressed the same issues as Scottsdale's motion for summary judgment, we affirm those denials for the reasons stated above.

having to defend the Alabama Lawsuit while simultaneously waging battle with their own insurer." This argument lacks merit for two reasons. First, the magistrate judge did not limit discovery that pertained to the coverage issue, and even took care to explicitly note that discovery requests would not be objectionable simply because they related to both claims. While plaintiffs claim that they "would have to proceed with discovery at their peril, knowing there would be a fight in every deposition over whether a sufficient overlap existed", the magistrate judge did not leave them out in the cold, stating that a "party may request a conference with the Court to resolve any dispute that the parties are unable to resolve on their own." That discovery disputes could possibly arise does not create an abuse of discretion, nor does the fact that plaintiffs would have to expend some time and resources litigating a lawsuit that they filed.

Second, plaintiffs argue that the magistrate judge's order made discovery more cumbersome and expensive, but in practice, it did the opposite. They describe a hypothetical situation in which they prevail on the issue of coverage and would then have to take duplicative discovery on the bad faith issue, forcing them to "retake depositions all over the country again." This did not happen. If it did, the district court would have discretion to streamline discovery. Here, the magistrate judge specifically directed the parties to "proceed with a view to minimizing the risk of unnecessary expense and burden to any party." None of plaintiffs' arguments have merit, and the district court did not abuse its discretion in limiting discovery on the bad faith claims. Accordingly, we affirm the magistrate judge's decision as well.

VII.

For these reasons, we affirm the district court's judgment.